In the Matter of WILLIAM A. HYMAN, Respondent, *v.* JEWISH CHRONIC DISEASE HOSPITAL, Appellant.

Second Department, July 7, 1964.

*Morris Ploscowe* and *Harvey I. Sladkus* for appellant.

*William A. Hyman,* respondent in person.

*Hayt & Hayt* (*Emanuel Hayt* of counsel), for Hospital Association of New York State, *amicus curiæ.*

*Daniel F. Scanlan* for Patients Aid Society, Inc., *amicus curiæ.*

*Per Curiam.* The question presented on this appeal is whether a member of the board of directors or of the board of trustees of a hospital membership corporation is entitled as a matter of right to an inspection of medical charts of patients at the hospital. Special Term held that he is so entitled. We are of the contrary opinion.

Special Term directed that the hospital also permit petitioner to inspect records of a financial and administrative nature (e.g., books of account, fiscal records, minutes of the meetings of the board of directors, of its medical boards and committees, and rules and regulations governing the handling of patients). The hospital has acceded to such direction and has allowed petitioner to inspect such records; and such records are not involved on this appeal.

The genesis of this controversy and the facts giving rise to it may be briefly stated:

As the result of approximately 10 years of research, Dr. Chester M. Southam of the Sloan-Kettering Institute for Cancer Research found that cancer patients did not have as marked a defense against cancer as did noncancer patients. It is a biological law that human beings will reject cells which are transplanted from another human being unless both persons are of precisely the same genetic constitution (e.g., identical twins). It was found that, when a healthy individual was injected with the cancer cells of another individual, the healthy person promptly rejected the transplant, whereas when a cancer patient was injected with such foreign cancer cells, rejection of the transplant was delayed. What was not known was whether the foreign cancer cells lived longer in cancer patients (as contrasted with noncancer patients) as the result of the pre-existing cancer or as the result of the patient's general weakness and debilitation. It was this question which Dr. Southam attempted to answer by the experiments conducted at the Jewish Chronic Disease Hospital; and it is these experiments which are involved on the present appeal.

The experiments showed that the sick and debilitated noncancer patients had the same response to foreign cancer cells as healthy volunteers, that is, there was a prompt rejection of the transplant. This in turn opened a wide possibility that, if there be such a biological mechanism as a defense against cancer, it may be possible to stimulate it either before cancer strikes or perhaps even later when the cancer has taken hold.

The project was financed by the United States Public Health Service and by the American Cancer Society. It was undertaken by Drs. Southam and Levin of the Sloan-Kettering Institute at the Jewish Chronic Disease Hospital, with the permission of Dr. Mandel, director of the department of medicine and director of medical education of the hospital.

On July 16, 1963, under the supervision of Drs. Southam and Levin, 22 patients at the hospital were injected with foreign cancer cells on the anterior surface of one thigh at two sites just beneath the skin. The patients were not told that the injection was of cancer cells because the doctors did not wish to stir up any unnecessary anxieties in the patients. The doctors felt there was no need to tell the patients that the injected material contained cancer cells because: (a) it was of no consequence to the patients; (b) the precise nature of the foreign cells was irrelevant to the bodily reactions which could be expected to

occur; (c) it was not germane to the reaction being studied; and (d) it was not a cause of increased risk to the patient.

However, the patients were told that an injection of a cell suspension was planned as a skin test for immunity or response. The patients were also told that within a few days a lump would form and would last for several weeks and gradually disappear. The patients were observed for several weeks after the injection of July 16, 1963. As expected, the lump developed and disappeared within an average period of from six to eight weeks.

The hospital and the doctors in charge of the experiment claim that each patient gave his oral consent. Petitioner, however, claims that the patients were either incompetent to give their consents or that they did not understand to what it was they were being asked to consent.

On December 12, 1963 this article 78 proceeding was instituted by petitioner to obtain the hospital records which are involved in this proceeding, as well as the hospital's financial and administrative records. The application was granted at Special Term on the ground: (a) that, regardless of his motives, a director of a membership corporation, as well as a director of a business corporation, has the absolute and unqualified right to inspect corporate records; and (b) that the disclosure of the patients' medical records to a member of the hospital's board of directors is not within the doctor-patient privilege because it is a disclosure to a member of the hospital's administration — one who has a legitimate interest in the contents of the patients' records.

In our opinion, the determination of the Special Term was improper for several reasons:

(1) Although the experiments were not conducted for the purpose of diagnosis or treatment of the patients, the results of such experiments nevertheless comprised part of the medical charts of the patients and, therefore, come within the physician-patient privilege (*Matter of Council of City of N. Y.* v. *Goldwater*, 284 N. Y. 296). Since the patients have concededly not waived the privilege, petitioner is not entitled to an inspection of such records.

(2) It has become a well-settled rule that a director of a stock corporation is entitled to an inspection of the corporate books in order to keep himself informed as to the corporation's policies, business and activities so that he may carry out his duty to direct its affairs (*Matter of Cohen* v. *Cocoline Prods.*, 309 N. Y. 119). The rule also applies to a membership corporation (*Matter of Davids* v. *Sillcox*, 297 N. Y. 355). However, by this rule it was never intended to permit a member of the board of

directors or of the board of trustees of a hospital to inspect the medical charts of hospital patients (*Munzer* v. *State of New York,* 41 N. Y. S. 2d 98; *Munzer* v. *Blaisdell,* 183 Misc. 773, affd. 269 App. Div. 970).

(3) A corporate director is also entitled to an inspection of the corporation's books because he may be subjected to liability for improper management during his term of office (*Matter of Cohen* v. *Cocoline Prods., supra*). However, the possibility of petitioner's liability is here nonexistent. Section 46 of the Membership Corporations Law provides that, in the absence of fraud or bad faith, the directors of a membership corporation are not personally liable for its debts, obligations or liabilities. It is only when a director personally participates in a wrongful act that he is personally liable (*Hinkle Iron Co.* v. *Kohn,* 229 N. Y. 179). There is no claim of bad faith or fraud or of personal participation on the petitioner's part.

(4) The petitioner does not have the right, in his capacity as trustee or director, to act for the hospital's patients. It is only the patient or his physician who can act for the patient. No proceeding by any patient to obtain the information in question has been instituted.

(5) The hospital's future policy will be in accordance with petitioner's contention that experiments such as the one here involved should be done only with the patient's written consent after the patient has been properly informed. On September 7, 1963 the hospital's grievance committee approved the experiment. On September 30, 1963 its board of directors approved its grievance committee's report. On January 27, 1964 the hospital's research committee approved continuance of the cancer immunization studies, but only upon the written, informed consents of the patients. Therefore, no further need for the inspection exists. It should be noted that petitioner is now in possession of the facts as to the manner in which the experiment was conducted on July 16, 1963; as to what information was given to the patients; and as to what information was not given to them.

Accordingly, the order, insofar as appealed from, should be reversed on the law and the facts, with costs; and the petitioner's application should be denied insofar as petitioner seeks the disclosure of the: (a) charts and records of patients who had been subjected to the experimental injection of live cancer cells; (b) the death certificates of any such injected patients who later died; and (c) the pathological studies, slides and laboratory data relating to all of said injected patients.

The inspection under the order (insofar as the order has not been reversed) shall proceed on 20 days' written notice or on such other date as the parties may mutually fix by written stipulation.

BELDOCK, P. J., BRENNAN, HILL and HOPKINS, JJ., concur in *Per Curiam* opinion; CHRIST, J., concurs in the result.

Order, insofar as appealed from, reversed on the law and the facts, with costs; and the petitioner's application denied insofar as petitioner seeks the disclosure of the: (a) charts and records of patients who had been subjected to the experimental injection of live cancer cells; (b) the death certificates of any such injected patients who later died; and (c) the pathological studies, slides and laboratory data relating to all of said injected patients.

The inspection under the order (insofar as the order has not been reversed) shall proceed on 20 days' written notice or on such other date as the parties may mutually fix by written stipulation.