696 F.2d 135
 8 Ed. Law Rep. 554
 Marigold E. MASON, Plaintiff, Appellant,
v.
SOUTHERN NEW ENGLAND CONFERENCE ASSOCIATION OF SEVENTH-DAY
ADVENTISTS OF the TOWN OF SOUTH LANCASTER,
COMMONWEALTH OF MASSACHUSETTS,
Defendant, Appellee.
 No. 82-1169.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 10, 1982.
Decided Dec. 27, 1982.
 
 Graydon G. Stevens, Portland, Me., with whom Kelly, Remmel & Zimmerman, Portland, Me., was on brief, for plaintiff, appellant.
 Stephen Hessert, Portland, Me., with whom David C. Norman, James D. Poliquin, and Norman & Hanson, Portland, Me., were on brief, for defendant, appellee.
 Before SWYGERT,* Senior Circuit Judge, BOWNES and BREYER, Circuit Judges.
 SWYGERT, Senior Circuit Judge.
 
 
 1
 This diversity case, in which the plaintiff-appellant seeks damages for injuries she sustained on the defendant's negligently maintained premises, presents two issues on appeal. The first is a choice of law question, and the second concerns the scope of Massachusetts' charitable immunity statute. Because we hold that Massachusetts law should govern and that the defendant is protected by the immunity statute, we affirm.
 
 
 2
 * The defendant, the Southern New England Conference Association of Seventh-Day Adventists ("Association"), is stipulated by the parties to be a charitable, nonprofit organization incorporated under the laws of Massachusetts. It operates a private religious school, South Lancaster Academy, in South Lancaster, Massachusetts. The Academy building contains, in addition to classrooms and the like, a multi-purpose room with a motion picture screen generally used for showing educational films.
 
 
 3
 On December 20, 1975, the plaintiff, Marigold Mason, a resident of Maine, attended an extended family reunion and Christmas party at the Academy. The Association had made the building available to the family free of charge, on the request of a Massachusetts family member who had once served on the Academy school board and whose children attended the school. Many of the family members, including the plaintiff, were Seventh-Day Adventists and former students at the school. During the party the motion picture screen fell, injuring Mason.
 
 
 4
 Mason and her husband brought suit in the United States District Court for the District of Maine. On June 5, 1981, judgment was entered on jury verdicts awarding $149,881.80 to Mrs. Mason for her injuries and $6000 to Mr. Mason for loss of consortium. On the Association's motion to amend the judgment in light of the Massachusetts limited charitable immunity statute, Mass.Gen.Laws Ann. ch. 231, Sec. 85K (West Supp.1982),[1] the court reduced the amount of the personal injury award to $20,000 plus interest and costs, the parties having settled Mr. Mason's claim.
 
 
 5
 Mason appeals from the amended judgment, arguing first that the district court should have applied the law of Maine, under which she might have recovered full damages,[2] and second that Massachusetts law, if applicable, does not limit recovery because the Association's activities in question were not "directly charitable." We address these contentions in turn.
 
 II
 
 6
 In diversity cases a federal court must apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The district court below was therefore bound to look to Maine conflicts principles.
 
 
 7
 In Beaulieu v. Beaulieu, 265 A.2d 610 (Me.1970), the Maine Supreme Court abandoned its former rule of applying the lex loci delicti in tort cases, and chose to apply Maine law rather than that of Massachusetts, where the injury occurred. Beaulieu does not mean that the law of the forum state is always to be preferred, however. In that case the court declined to apply Massachusetts' automobile guest statute because Maine contacts (the residence of the driver and passenger, the origin and destination of the journey, the state of registration and insurance of the automobile) dominated. The court clarified its approach in Adams v. Buffalo Forge Co., 443 A.2d 932, 934 (Me.1982), specifically endorsing the "most significant relationship" test of the Restatement (Second) of Conflict of Laws Secs. 145-146 (1971). In determining what law a Maine court would apply, therefore, we must turn to the Restatement.
 
 
 8
 Section 6 of the Second Restatement[3] lists various general policy considerations relevant to choice of law. In tort cases, the Restatement counsels the court to apply the law of the state with the most significant relationship to the parties and event, weighing enumerated contacts in applying the standards of section 6. Id. Sec. 145.[4] The Restatement further specifies that in personal injury cases the court should choose the law of the state of injury unless another state's relationship to the injury is more significant, judged by the section 6 criteria. Id. Sec. 146.[5] Our task is therefore to determine whether the presumptive applicability of the law of the state of injury (Massachusetts) was overcome by policy considerations or by an imbalance of contacts.
 
 
 9
 The contacts in this case weigh heavily toward Massachusetts. The only contact with Maine is the residence of the plaintiff; all the others deemed significant by section 145(2) (place of injury, place of the conduct that caused the injury, residence of the defendant, and place where the relationship between the parties is centered) are with Massachusetts.
 
 
 10
 The considerations of section 6, evaluated in light of the dominant contacts, do not compel the application of Maine law. Some of the factors (needs of the interstate system; protection of expectations; certainty, predictability and uniformity of result) are geared more toward consensual relationships than tort situations. See In re Air Crash Disaster, 399 F.Supp. 1106, 1111 n. 8 (D.Mass.1975); Restatement (Second) of Conflict of Laws Sec. 6 comments d, g, i (1971). To the extent that predictability should be considered, it counsels giving the interest of the forum state no greater weight (simply because of its status as the forum) than that of any other interested state, lest forum-shopping and nonuniformity result.
 
 
 11
 The policies of the forum state and the other interested state, two more considerations listed in section 6, are a wash in this case to the extent that they conflict. If we construe the relevant statutes as the plaintiff urges,[6] Massachusetts' law protects its resident by imposing a $20,000 ceiling in suits against charitable institutions; Maine's law protects its resident by permitting judgments against charitable institutions to the extent of their insurance. These policies therefore at best furnish no principle for choosing which law to apply; if the dominance of Massachusetts contacts makes that state's interests more weighty, the balance may tip against the plaintiff's wishes.
 
 
 12
 Nor do the general policies underlying the field of charitable immunity furnish a principle of decision. Both Maine's and Massachusetts' statutes limit that immunity, and we hesitate to pronounce one method better than the other. In some cases Massachusetts' law will allow more generous recovery than Maine's, either because no judgment ceiling is imposed when the activity involved is "primarily commercial," or because the institution's insurance coverage falls short of $20,000. Maine's system of allowing charities to choose the extent of their liability in their insurance contracts is not clearly superior to Massachusetts' system in promoting the goals of compensating the injured while protecting charitable institutions.
 
 
 13
 Finally, section 6 counsels courts to consider what choice of law rule would be easiest to determine and apply. Our preceding discussion should demonstrate that following the presumption of section 146 is simplest. The presumptive applicability of the law of the state of injury (strengthened because the conduct that caused the injury occurred in the same state, see Restatement (Second) of Conflict of Laws Sec. 146 comment d (1971)) controls in this case because no compelling reason exists to substitute Maine law. We therefore find the district court's application of Massachusetts law unexceptionable.[7]
 
 III
 
 14
 The Massachusetts limited charitable immunity statute, Mass.Gen.Laws Ann. ch. 231, Sec. 85K (West Supp.1982), abrogates the tort immunity afforded charitable institutions at common law. It goes on to provide two things: that in cases involving "any activity carried on to accomplish directly the charitable purposes" of the institution, liability is limited to $20,000; and that this limitation does not apply when "the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue for charitable purposes."
 
 
 15
 Assuming that Massachusetts law applies, Mason argues that section 85K does not limit recovery in this instance. Although she concedes that the Association's activity was not commercial, she interprets the statute's "directly charitable" and "primarily commercial" categories to be nonexclusive, and contends that the activity involved in this case was only indirectly charitable. Mason concludes that the abrogation of immunity controls.
 
 
 16
 We disagree. Because the language of the statute may support varying interpretations, we may look beyond its compass to aid interpretation. The legislative history shows, and the parties agree, that the legislature adopted section 85K in order to preserve the contours of common law charitable immunity in the face of a threat of judicial abolition, see Colby v. Carney Hospital, 356 Mass. 527, 528, 254 N.E.2d 407, 408 (1969), while replacing immunity with a limitation of liability. See Mass.Gen.Laws Ann. ch. 231, Sec. 85K, 1972 comment (West Supp.1982); H.R.Doc. No. 5976 (Mass.1971). Our examination of the cases explicating the old Massachusetts common law reveals that charitable institutions were immune from liability for their torts whenever they acted within the scope of their charitable purposes and their activity was not primarily commercial. The three categories of activities (noncharitable, charitable-and-noncommercial, and charitable-but-commercial) thus were exclusive.
 
 
 17
 The common law cases reached this resolution by degrees. The early cases establishing the immunity simply emphasized the charitable nature of the activities, see, e.g., McDonald v. Massachusetts General Hospital, 120 Mass. 432, 434-35 (1876); see also Reavey v. Guild of St. Agnes, 284 Mass. 300, 301, 303, 187 N.E. 557, 558 (1933) (noting rule that activity must be within charitable corporate powers for immunity to apply), reasoning that it would be improper to divert to tort judgments funds donated for charitable purposes. See cases collected in Annot., 25 A.L.R.2d 29, 60 & n. 15 (1952). This "trust fund" rationale made the status of the plaintiff irrelevant: the injured party need not have any particular relationship to the charity, or indeed any relationship with it at all, to be barred from collecting. See, e.g., Foley v. Wesson Memorial Hospital, 246 Mass. 363, 365, 141 N.E. 113, 113 (1923).
 
 
 18
 The trust fund rationale did not justify barring suit in certain other circumstances, however. Liability for torts committed in the course of revenue-generating activities of charitable institutions posed less risk of frustrating the intentions of donors, even if that revenue was intended to be put to charitable use. Whenever the purpose of the activity was to make money, therefore, the immunity was lost. See Grueninger v. President and Fellows of Harvard College, 343 Mass. 338, 340, 178 N.E.2d 917, 918-19 (1961) (operation of hospital); McKay v. Morgan Memorial Co-op. Industries & Stores, Inc., 272 Mass. 121, 126, 172 N.E. 68, 69 (1930) (running a store); Holder v. Massachusetts Horticultural Society, 211 Mass. 370, 373, 97 N.E. 630, 630-31 (1912) (leasing a building); Phipps v. Aptucxet Post # 5988 V.F.W. Building Association, Inc., 7 Mass.App. 928, 930, 389 N.E.2d 1042, 1043 (1979) (holding dances). Whenever revenue was produced only incidentally to some charitable activity, or no revenue was produced at all, however, the immunity was retained, apparently because the certainty of a judgment fund was attenuated. See Carpenter v. YMCA, 324 Mass. 365, 367, 370, 86 N.E.2d 634, 635-36, 637 (1949) (operating a playground); Enman v. Trustees of Boston University, 270 Mass. 299, 300, 170 N.E. 43, 44 (1930) (running a dormitory). This principle was summarized by McKay v. Morgan Memorial Co-op. Industries & Stores, Inc., 272 Mass. at 124, 172 N.E. at 69, in language strikingly similar to section 85K:
 
 
 19
 The distinction is between activities primarily commercial in character carried on to obtain revenue for charitable purposes ..., where there is liability for negligence, and activities carried on to accomplish directly the charitable purposes of the corporation, incidentally yielding revenue, ... where there is no liability for negligence.
 
 
 20
 The genesis of this distinction indicates that "directly" charitable activities are meant to be contrasted with those activities whose thrust is commercial, rather than with all the other forms of activities that may in some sense be only indirectly charitable. Thus, painting a building, see Reavey v. Guild of St. Agnes, 284 Mass. at 302, 187 N.E. at 558, or maintaining steps or a sidewalk, see Enman v. Trustees of Boston University, 270 Mass. at 300, 170 N.E. at 44; Glaser v. Congregation Kehillath Israel, 263 Mass. 435, 436, 161 N.E. 619, 620 (1929), are directly charitable even though the physical plant is not the true object of the charity's bounty, because painting and maintenance are not carried on to produce revenue.[8]
 
 
 21
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 22
 In analyzing the present case we must therefore determine whether the Association's activity was within its corporate powers, and, if so, whether it was directly charitable in this sense. A threshold inquiry, however, is what the Association's activity was. Mason urges us to focus on her role in the incident and thus to characterize the activity as the letting of a room without charge for a noncharitable use. The Association, relying on the cases that hold the status of the plaintiff irrelevant, urges us to focus on its role and thus to characterize the activity as the maintenance of its charitable premises. Each of these characterizations is only partially correct. The Association rightly contends that it is not critical that the plaintiff was not engaging in a charitable activity on the premises; neither were the passersby who were injured in cases like Enman, supra. This does not mean, however, that the relationship between Mason and the Association has no relevance. What the Association did is defined in part by that relationship: its activity was the maintenance of a room normally used for educational purposes but lent on this occasion to a private group for a private party.
 
 
 23
 The critical question therefore is whether this activity was in conformity with the Association's admittedly charitable corporate purposes. We find that it was. The Association's charter provides that it was
 
 
 24
 constituted for the purpose of diffusing moral and religious knowledge by means of churches, missions, training schools, medical or health institutions, missionary agencies, and all other instrumentalities and methods appropriate and available for the tending to the advancement of such ends and aims.
 
 
 25
 We have no doubt that building and maintaining the Academy fall within these powers, and this conclusion is not changed by the Association's lending the facilities to some of its members. In that respect the case is no different than Enman, supra, in which maintenance of a dormitory was held charitable even though the university's goal was to educate rather than to house students. In both cases the defendant's interest in its constituency is quite broad. This is not to say that renting the premises for the sake of the income or loaning them for a purpose actually contrary to the corporate charter would be charitable; but this is not that kind of case.
 
 
 26
 Because there is no dispute that the Association's activities were not "primarily commercial," we conclude that section 85K's limitation of liability applies. The judgment of the district court is therefore
 
 
 27
 AFFIRMED.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation
 
 
 [1]
 Mass.Gen.Laws Ann. ch. 231, Sec. 85K (West Supp.1982) provides:
 It shall not constitute a defense to any cause of action based on tort brought against a corporation, trustees of a trust, or members of an association that said corporation, trust, or, association is or at the time the cause of action arose was a charity; provided, that if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation, trust, or association, liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. Notwithstanding any other provision of this section, the liability of charitable corporations, the trustees of charitable trusts, and the members of charitable associations shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.
 
 
 [2]
 Me.Rev.Stat.Ann. tit. 14, Sec. 158 (1980) provides:
 A charitable organization shall be considered to have waived its immunity from liability for negligence or any other tort during the period a policy of insurance is effective covering the liability of the charitable organization for negligence or any other tort. Each policy issued to a charitable organization shall contain a provision to the effect that the insurer shall be estopped from asserting, as a defense to any claim covered by said policy, that such organization is immune from liability on the ground that it is a charitable organization. The amount of damages in any such case shall not exceed the limits of coverage specified in the policy, and the courts shall abate any verdict in any such action to the extent that it exceeds such policy limit.
 
 
 [3]
 Restatement (Second) of Conflict of Laws Sec. 6 (1971) provides:
 Choice-of-Law Principles
 (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
 (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.
 
 
 [4]
 Id. Sec. 145 provides:
 The General Principle
 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Sec. 6.
 (2) Contacts to be taken into account in applying the principles of Sec. 6 to determine the law applicable to an issue include:
 (a) the place where the injury occurred,
 (b) the place where the conduct causing the injury occurred,
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 
 [5]
 Id. Sec. 146 provides:
 Personal Injuries
 In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
 
 
 [6]
 We assume, for purposes of this discussion, that this is not a case in which charitable immunity is completely removed by Massachusetts law; otherwise the plaintiff would be content to have that law applied. Likewise, we assume that the Association's insurance coverage exceeds $20,000; otherwise the plaintiff would prefer Massachusetts law
 
 
 [7]
 Our conclusion makes it unnecessary to consider the Association's argument that the district court's application of Massachusetts law was, at worst, invited error
 
 
 [8]
 We may illustrate the resulting pattern of limited immunity by the following diagram:
 Liability is limited only when the activity in question is both charitable and not primarily commercial (the shaded area); liability is unlimited when the activity is noncharitable, primarily commercial, or both.