DENNIS J. MISSETT, JR., & others[1] vs. CARDINAL
CUSHING HIGH SCHOOL.

No. 95-P-342.

Suffolk. November 12, 1996. - June 20, 1997.

Present: BROWN, LAURENCE, & FLANNERY, JJ.

*Negligence*, School, Proximate cause. *Corporation*, Charitable corporation.
*Charity. Words*, "Learning," "Primarily commercial."

At the trial of a civil action, there was ample evidence from which the jury
could conclude that the defendant high school's negligence in organizing
and supervising a teenage dance was the cause of injuries suffered by a
student stabbed while attending the dance. [8-9]
For purposes of the applicability of G. L. c. 231, § 85K, capping the tort li-
ability of a charitable institution, a Roman Catholic high school's organiz-
ing and supervising of a teenage dance was an activity carried on to ac-
complish its charitable purpose of conducting a school "for learning" and
was not an activity that was "primarily commercial"; as a consequence, a
student injured at such a dance due to the school's negligence was not
entitled to damages greater than the statutory limit. [9-12]

CIVIL ACTION commenced in the Superior Court Department on
April 28, 1992.

The case was tried before *Gordon L. Doerfer*, J.

*Wilson D. Rogers, III*, for the defendant.

*John B. Glynn* for the plaintiffs.

FLANNERY, J. The plaintiffs, Dennis J. Missett, Jr., and his
parents, Ann and Dennis J. Missett, brought this action for
negligence and loss of consortium against the defendant,
Cardinal Cushing High School, for injuries suffered when
Dennis J. Missett, Jr., was stabbed while attending a dance at
the high school. A Superior Court jury entered verdicts for the
plaintiffs awarding $70,500 in total damages. The trial judge,
who had reserved the question of whether the charit-

[1]Ann Missett and Dennis J. Missett.

able immunity "cap," G. L. c. 231, § 85K, applied in the case, concluded that the dance was not an "activity carried on to accomplish directly the charitable purposes" of the defendant.[2] Thus, the $20,000 limit in c. 231, § 85K, did not apply. The defendant appeals, challenging the trial judge's denial of its motion for directed verdict and the judge's ruling that the cap in c. 231, § 85K, does not apply here.[3] We affirm the denial of the defendant's motion for directed verdict but remand this case for entry of judgment against the defendant limited to the statutory cap of c. 231, § 85K.

Considering the evidence in the light most favorable to the plaintiffs and the rational inferences to be drawn therefrom, *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976); *Sullivan* v. *Brookline*, 416 Mass. 825, 826 (1994), the jury could have found as follows. On February 16, 1990, the student council at Cardinal Cushing High School, an all-girls Catholic school, sponsored a dance. The student council advertised the dance to several nearby all-boys schools. The profits from the dance were to be used by the student council for educational and recreational activities. Deborah O'Connell, a teacher at the school, acted as the student council's faculty supervisor. There had been arguments at previous Cardinal Cushing dances, so it was the school's policy to have a uniformed policeman in attendance. Thus, in addition to arranging to have chaperons at the dance, O'Connell arranged for a police detail.

The dance was held in the defendant's gymnasium, which is roughly the size of a basketball court. At one end of the gymnasium is a stage near which a disc jockey was located. There was a table at the entrance to the gymnasium, where a student sold admission tickets for three dollars. Neither the student nor any of the chaperons checked for high school identifications.

Along with O'Connell, three other chaperons were present

[2]The record indicates that the parties agreed to argue the applicability of the cap in G. L. c. 231, § 85K, to the judge after the jury returned their verdicts on the negligence and loss of consortium claims, thereby waiving jury findings concerning § 85.

[3]The defendant's notice of appeal also stated that it is appealing from the trial judge's allowance of the plaintiffs' expert's testimony, a ruling on testimony pertaining to the plaintiffs' damages, and a ruling on the admissibility of a letter. These issues were not argued in the defendant's brief, so we do not address them. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

at the beginning of the dance: a teacher, Stephen Belyea; Sister Mary Clancy; and the evening's custodian, Tom O'Connor.[4] O'Connell gave no instructions to the other chaperons. Belyea, who arrived just before 7 P.M., spent the first forty-five minutes in the ticket-selling area. Sister Mary Clancy, who also arrived around 7 P.M., stood by the ticket table for a while and then walked around the gymnasium. O'Connor patrolled the gymnasium looking for smokers, picking up debris, and making sure everyone was having a good time. O'Connell, who was keeping a look-out for anyone under the influence of drugs or alcohol, divided her time between watching the entrance to the dance and the rest of the gymnasium.

As the dance began at 7 P.M., the police detail had not arrived. During the next several hours, O'Connell called the police department approximately four times to ask about the detail, but the police never came. Meanwhile, teenagers entered the dance. The gymnasium's lights were slowly dimmed. At 8 P.M., about the time that Missett, Jr., arrived at the dance, there were roughly 100-150 teenagers in the gymnasium dancing. It was the defendant's policy to close admission to its dances at 9 P.M. and not to readmit any students leaving after that time. Despite this policy, a group of about fifteen young men were allowed into the dance shortly after 9 P.M.

About 9:30 P.M., an informal dance contest, punctuated by yelling and pushing, began between some white and black teenagers. A large crowd gathered to watch. The contest became confrontational. Sister McGuirk, therefore, asked the disc jockey to play some slower music. He did, but, subsequently, when the disc jockey played faster music, the contest started anew.

At 9:45 P.M., Sister Mary Clancy left the dance. Only Belyea, Sister McGuirk, and O'Connell remained as chaperons.[5] All three were standing near the entrance to the gymnasium. Apparently sensing that something was wrong, Belyea and

---

[4]Sometime during the evening, a fourth chaperon, Sister Christine Julie McGuirk, arrived at the dance.

[5]O'Connor, the custodian, had left the dance earlier, and was outside the gymnasium when a fight erupted between three white youths and one black youth just before 10 P.M. He broke up the fight, ejected the participants from the school's property, and called the police.

O'Connell moved toward the center of the gymnasium where they saw a black teenager fall limply to the floor. Realizing that the youth was injured, Belyea left to call for an ambulance, leaving O'Connell and Sister McGuirk as the only chaperons in the gymnasium.[6]

The crowd of 150 teenagers quickly grew unsettled. A student took the disc jockey's microphone and asked everyone to calm down. With none of the chaperons visible on the stage or the dance floor, the disc jockey resumed the music. As students headed for the exit door, a bottleneck formed.

Within seconds, the dimly lit gymnasium erupted into a melee. People began yelling, throwing chairs, hitting one another with chairs and fists, overturning tables, discharging a fire extinguisher, and brandishing knives.

After looking for other exits from the gymnasium, Missett, Jr., entered the bottleneck of people attempting to leave. Suddenly he felt a "weird warm . . . feeling" in his side that knocked the wind out of him. Looking over his shoulder, he realized that he had been stabbed in the back. He fell to one knee. A friend helped him get up and out of the gym and to a nearby restaurant, where the owner called for an ambulance.[7]

At trial, the plaintiffs' expert witness on security testified to inadequacies in the defendant's organization and supervision of the dance. Of particular significance, the expert stated that, when the police detail had not arrived by 8 P.M., the defendant should have stopped the dance.[8]

1. *The defendant's motions for directed verdict.* The defendant contends that the trial judge erred in denying its motions for directed verdicts under Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974).[9] A judge may direct a verdict only if, viewing the evidence most favorably to the plaintiff, it does not support a verdict in his favor. *Alholm* v. *Wareham*, 371 Mass. at 627. Determining if an issue of fact for the jury exists requires a court "reasonabl[y] [to] view . . . the evidence"

---

[6]The gymnasium only had one coin-operated telephone.

[7]The melee at the school continued until the police arrived. One other person was stabbed.

[8]The plaintiffs' expert also cited inadequate lighting, too few chaperons, the lack of strategic assignment of the chaperons in the gymnasium, and the lack of a security plan as factors contributing to the melee.

[9]The defendant moved for a directed verdict. at the close of the plaintiffs' case and at the close of all the evidence.

looking for " 'a combination of facts from which a rational inference may be drawn in favor of the plaintiffs.' " *Ibid.*, quoting from *Chase* v. *Roy*, 363 Mass. 402, 404 (1973).

Here, the defendant argues that both the Boston police department's failure to provide a police detail and the third party's criminal act of stabbing were unforeseeable superseding and intervening causes relieving it of any liability for the plaintiffs' injuries. The jury's finding to the contrary, the defendant submits, was unsupported by the evidence. Viewing the evidence in the light most favorable to the plaintiffs, we conclude that there was ample evidence from which the jury could conclude that the high school's negligence was the legal cause of the plaintiffs' injuries. See *Flood* v. *Southland Corp.*, 33 Mass. App. Ct. 287, 296-299 (1992), *S.C.*, 416 Mass. 62, 71-73 (1993). The defendant's argument to the contrary is unpersuasive.

2. *Applicability of G. L. c. 231, § 85K.* The defendant next contends that the trial judge erred in ruling that the charitable immunity cap contained in G. L. c. 231, § 85K, does not apply here. In pertinent part, § 85K, as inserted by St. 1971, c. 785, § 1, limits a charitable corporation's liability to $20,000, if it commits a tort "in the course of any activity carried on to accomplish directly the charitable purposes of such corporation." The statute also states that the limitation does not apply if "the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes."

Neither side disputes the judge's finding that the defendant is a charitable corporation within the meaning of § 85K and that its charitable purposes are, "among other things, to acquire, hold, own, use, manage and control real and personal property for the purpose of operating schools and institutions for learning within the Commonwealth of Massachusetts conducted under the auspices of the Roman Catholic Church and its affiliated religious organizations." The relevant inquiry here, therefore, is whether the dance was a "primarily commercial" activity or an activity directly related to the high school's charitable purpose of running a school "for learning." *McKay* v. *Morgan Memorial Co-op. Indus. & Stores, Inc.*, 272 Mass. 121, 124 (1930).

The trial judge concluded that the dance was not an "activity carried on to accomplish directly the charitable purposes"

of the defendant, and, consequently, the cap in c. 231, § 85K, did not apply. In reaching this conclusion, the judge distinguished between "direct" and "indirect" educational benefits resulting from the dance and, although not expressly ruling so, implied that the dance was a "primarily commercial" activity. We address both points in turn.

First, although acknowledging that there were some "incidental educational benefits" resulting from the students' organizing, advertising, and running the dance here, the judge concluded that these benefits were only "indirectly" related to the defendant's charitable purposes. Implicit in the judge's decision is that the defendant's charitable purpose of running a school for learning would be "directly" furthered only by classroom related activities or seminars.

We believe the judge misconstrued the term "directly" as it is used in § 85K. Under the statute, " 'directly' charitable activities are meant to be contrasted with those activities whose thrust is commercial, rather than with all the other forms of activities that may in some sense be only indirectly charitable." *Mason* v. *Southern New England Conference Assn. of Seventh-Day Adventists,* 696 F.2d 135, 139 (1st Cir. 1982). See *St. Clair* v. *Trustees of Boston Univ.,* 25 Mass. App. Ct. 662, 668 n.6 (1988). See also *Harlow* v. *Chin,* 405 Mass. 697, 715 (1989) (stating that an activity is "commercial" rather than "charitable" only if its objective "is merely to generate revenue"). Thus, whether the educational benefits of the dance are "indirect" rather than "direct" is not determinative; that some educational benefits resulted from the students' organizing, advertising, running, and participating in the dance is enough under § 85K to conclude that the dance accomplished directly the charitable purposes of the school. The only question remaining is whether such educational benefits, and the dance in particular, fall within the ambit of conducting a school "for learning." We think they do. The word "learn" is defined as "gain[ing] knowledge or understanding of or skill in by study, instruction, or experience." Webster's Third New Intl. Dictionary 1286 (1993). As used here, "learning" is analogous to the term "education," which is to be broadly and comprehensively construed. See *Mount Hermon Boys' Sch.* v. *Gill,* 145 Mass. 139, 146 (1887) (broadly construing school's charitable purpose of "education of boys" to include running a farm which generated some revenue). Consequently, we broadly construe the term "learning."

The judge here, however, suggested that only classroom related activities are directly related to education or conducting a school "for learning." Such a construction of the defendant's charitable purpose is unduly narrow. We conclude that traditional extracurricular activities like this high school dance are within the defendant's charitable purpose of conducting a school "for learning."

Finally, having found that the primary purpose of the dance was to raise money for the student council, the judge apparently concluded that the activity was primarily commercial.[10] Reviewing § 85K and the pertinent case law predating its enactment, we believe the judge misconstrued the meaning of "primarily commercial." Generating revenue does not alone mean that an activity is "primarily commercial." In the context of § 85K, an activity is "primarily commercial" only when it is "entirely disconnected" from the charity's purposes. See *Holder* v. *Massachusetts Horticultural Soc.,* 211 Mass. 370, 373 (1912); *McKay* v. *Morgan Memorial Co-op. Indus. & Stores, Inc.,* 272 Mass. at 124; *St. Clair* v. *Trustees of Boston Univ.,* 25 Mass. App. Ct. at 668 n.6; *Linkage Corp.* v. *Trustees of Boston Univ.,* 425 Mass. 1, 28 n.37 (1997). Nothing in the judge's findings here suggests that this dance was entirely disconnected from the defendant's charitable purposes.

Moreover, cases in which courts have concluded that an activity was "primarily commercial" have involved the operation of full-fledged businesses. See *Mason* v. *Southern New England Conference Assn. of Seventh-Day Adventists,* 696 F.2d at 139, and cases cited therein. The plaintiffs have not directed us, nor has our review of the case law revealed, any cases in which school activities like the dance here were found to be "primarily commercial" activities.[11] We conclude that the dance is not a "primarily commercial" activity within the meaning of § 85K.

---

[10]Although not expressly ruling that the dance was a "primarily commercial" activity, the judge's analysis touched upon the supposed commercial nature of the dance. Accordingly, we briefly address the point.

[11]Indeed, the only other case involving a charitable corporation conducting a dance is *Phipps* v. *Aptucxet Post # 5988 V.F.W. Bldg. Assn., Inc.,* 7 Mass. App. Ct. 928, 930 (1979), which is inapposite. In *Phipps* we held that a jury could have found that regular Saturday night dances generating eighty-five to ninety percent of the defendant's income, which was being used primarily to pay mortgage and overhead expenses, was a primarily commercial activity, and not directly related to the charity's purpose. Unlike *Phipps,* the dance here was not a weekly event, the approximately $300

We affirm the Superior Court judge's denial of the defendant's motion for a directed verdict. We remand the case to the Superior Court for entry of a judgment against the defendant limited to the statutory cap set forth in G. L. c. 231, § 85K.[12]

*So ordered.*

---

in revenue generated by the dance here certainly did not constitute a significant source of income for the defendant, and the student council's discretionary use of the revenue from its activities cannot be equated with mortgage payments and overhead expenses on a building. Moreover, our construction of § 85K in this case (contrasting "directly" related activities with "primarily commercial" activities rather than "indirectly" related activities) is consistent with our analysis is *Phipps.*

[12]The cap in § 85K limits the aggregate amount of the defendant's liability to $20,000 for all of the plaintiffs' claims arising out of the stabbing. See *English* v. *New England Med. Center, Inc.*, 405 Mass. 423 (1989), cert. denied, 493 U.S. 1056 (1990) (affirming trial judge's reduction of an aggregate jury award of $350,000 to $20,000 pursuant to G. L. c. 231, § 85K).