Billings, A.J.
After hearing, and after careful consideration of the parties’ written submissions, the defendant’s motion for summary judgment is ALLOWED.
A. Facts
Plaintiff, who is blind and mildly retarded, was a “consumer” (client) of a vocational training program administered by the defendant (herein, “Morgan”) under contract with the Department of Mental Retardation. She worked at Morgan’s facility at 1010 Harrison Avenue, Boston, hanging clothes (apparently in connection with Morgan’s used clothing business). In its DMR contract, Morgan agreed to provide “[a] comprehensive vocational training program designed to assist individuals obtain community employment through career development, vocational skills training and job placement.”
The plaintiff alleges, with considerable substantiation, that on May 7 and 8, 1997 she was sexually assaulted by another consumer, Charles Rash. Rash was another consumer in the same program. Although the plaintiffs affidavit does not give the details of the assault, the reports of investigations by the DMR and the Disabled Persons Protection Commission indicate that Rash lifted the plaintiffs sweatshirt, cupped her breasts in his hands, touched them with his mouth, and then moved his hand inside her pants to touch her genital area. The plaintiff also reported to investigators that Rash had exposed his penis and asked her to touch it. Another consumer saw the incident and screamed. Goodwill staff responded and heard Rash say to the plaintiff, “I’m sorry, I’m sorry I touched you.” The plaintiff also reported a similar incident that had occurred the previous day, also involving Rash. Investigators on the 8th found both fresh and slightly healed scratches in the plaintiffs genital area, which they believed corroborated her account of the assaults on that and the previous day.
Rash, also a DMR referral, was known by Morgan at the time of his placement to suffer from undifferentiated schizophrenia, controlled in part by medication. When he assaulted the plaintiff, he had been at the facility for one to two months. Following the incident on May 8 he was removed from the work area, suspended from the program, then terminated. He was subsequently charged criminally in connection with the assaults, but was found incompetent to stand trial.
The DPPC investigator concluded that Morgan staff “responded appropriately to the incident and were not negligent.” The DMR investigator similarly stated, “It can be concluded that the allegation of omission . . . by staff at the Morgan Memorial day program be (sic) unsubstantiated.” The reports note that the Morgan program services high-functioning clients referred by both DMR and the Department of Mental Health, many of whom are being trained for private-sector employment; that there is a staff-to-consumer ratio of 2:20; that the work area is large, noisy, and has obstructed views; that the May 8 assault occurred during a break during which most consumers and staff were in the cafeteria, but plaintiff had remained working; and that there was a job coach in the area at her desk, but she was unable to see the plaintiff directly. The DMR report notes the absence in Rash’s folder of any indication of past incidents of assaultive or sexually assaultive behavior.
Plaintiff originally asserted two theories against Morgan. The first, that Morgan was vicariously liable for the acts of Rash, its “employee,” has been abandoned, presumably in view of Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393, 404-07 (1990) (employer not vicariously liable for workplace sexual assault because it was not “motivated ... in part, by a purpose to serve the employer”).
Plaintiffs second claim is that Morgan was negligent in accepting, retaining, and supervising Rash, and in its failure to provide adequate security for the plaintiff. The evidence offered in support of this theory, viewed in the light most favorable to the plaintiff, is as follows.
*279 1. In 1990, the Disabled Persons Protection Commission investigated a statement by Rash that he had been having sex with his mother. He later recanted, and the DPPC found, “sexual abuse not indicated.” The report of the investigation notes, “Client has a history of presenting delusional material having to do with sexual behaviors, angels, God, the heavens, including auditory hallucinations such as, ‘the radio told me to, it was the radio’s fault.’ ” The report nowhere suggests that Rash’s history included assaultive or predatory behavior. Nor is there any indication in the record that Morgan had this report at the time it accepted Rash, or at the time of the assaults, or that Morgan otherwise knew of the incident or the history recounted in the report, or whether Rash’s condition remained the same six and one-half years later.
2. Plaintiffs sister and guardian testified by affidavit that after the assault, a Detective Pamadoro of the Boston Police Department told her (a) that Rash had a history of sexual abuse; (b) that he should not have been admitted into Morgan’s program; (c) that his admission was the result of inadequate screening; and (d) that poor sight lines in the work space made it possible for Rash to have unnoticed access to the plaintiffs area. These statements are hearsay; their foundation (i.e., the basis of Pamadoro’s knowledge) is not established; and they contain opinions (particularly as to (b) and (c)) which Pamadoro is not shown to have been qualified to give. They fall well short, in other words, of meeting the requirements of Mass.R.Civ.P. 56(e), first sentence.
3. Plaintiffs sister also testified that after the assaults, Morgan personnel told her that Rash was a paranoid schizophrenic who, prior to May 1997, had been a resident for a long time at the Solomon C. Fuller Mental Health Center in Boston. This would be admissible as a statement of a party opponent. There was no elaboration, however, on such issues as why Rash was released, or what information Morgan had or could have obtained concerning his condition, or his propensity (if any) for sexually assaultive behavior.
4. Plaintiffs sister testified as well that she complained to Morgan, prior to the assaults and based on her personal observations while visiting the workplace, that the plaintiff was left alone, unsupervised and unprotected, in the back area where she worked. Large bins of clothing obstructed sight lines to this area. The plaintiff felt “scared" and “unsupervised.” In subsequent placements, she has received greater supervision and security.
5. In an affidavit of plaintiffs counsel, it is represented that;
On various occasions, Dr. Martin Kelly, a psychiatrist practicing his profession in Brookline, has opined that Charles Rash is an individual who needs strict supervision in a structured setting, is not at all an individual who should have been accepted in a program such as that in which Florence D’Amelio and Charles Rash were involved at Morgan Memorial Goodwill Industries, is an individual who remains not at all a candidate for a program like that at Morgan Memorial Goodwill Industries and is an individual who has been and remains incompetent to stand trial. And it is expected that Dr. Kelly will testify on behalf of the Plaintiff at any trial of her action.[1]
B. Discussion
The evidence set forth in the summary judgment record would not warrant the submission of this case to a jury.
As noted above, plaintiff s sister’s testimony of what Detective Pamadoro told her after the assaults would be inadmissible on several grounds.
Morgan was not shown to have had knowledge of the 1990 DPPC report before the assaults, and the report does not, at least on its face, suggest that Rash had either a history of or a propensity for sexual assault. The same is true of the information that Morgan apparently did have — that Rash was diagnosed with either undifferentiated or paranoid schizophrenia, and that he had until recently been released a mental health center.
In general, there was little evidence concerning what Morgan knew or should have known about Rash at the time he was accepted for placement, or at the time of the assault, beyond his diagnosis of schizophrenia and the fact that he- had recently left an inpatient facility. There is no indication (beyond Detective Pamadoro’s inadmissible statement) that Rash had exhibited aggressive, assaultive, or otherwise predatory behavior, either while at Morgan or before, and no indication whatsoever that Morgan knew of such behavior. One might envision a case in which a service provider such as Morgan violated a duty of care in failing to investigate a client referred by a mental health agency for services. Cf. Foster v. The Loft, Inc., 26 Mass.App.Ct. 289 (1988) (employer may be liable for failing to investigate employee’s known criminal record). In this case, however, there is no evidence as to what Morgan did or not do, and no evidence of what a more extensive inquiry would have disclosed, if anything, that Morgan did not know.
Dr. Kelly’s proposed testimony — apart from the question of its belated and perfunctory disclosure— does not address what Morgan should have done, based on what it knew about Rash at the time (as opposed to what Dr. Kelly now knows about him). On this, the ultimate standard-of-care issue in the case, plaintiff has proffered no expert testimony. There may be cases where the defendant’s inattention to security issues is “so gross or obvious that laymen can rely on their common knowledge to recognize or infer negligence.” Pongonis v. Saab, 396 Mass. 1005, (1985); cf. Bennett v. Winthrop Community Hospital, 21 Mass.App.Ct. 975 (no expert testimony needed in case *280 of unrestrained, intoxicated patient who was injured when he fell from stretcher, in view of his “frenetic conduct before removal to the hospital (knowledge of which was communicated to the hospital)”). This, however, is not such a case. At issue is the proper conduct of a service agency whose mission is vocational training of mentally impaired clients. What screening of this population should be performed, what placement decision should be made on the basis of a given diagnosis and histoiy, what security and supervision should be provided at a facility servicing this clientele, and how security concerns are appropriately accommodated to the program’s mission of training clients for community employment, are all questions beyond the ken of the average layperson. See generally Atlas Tack Corp. v. Donabed, 47 Mass.App.Ct. 221, 227 &n. 4 (1999), and cases cited. Expert testimony is frequently admitted, and at least one case from this Court has held it was required, in cases involving security issues arising in much less particularized settings than that involved here. E.g., Flood v. Southland Corp., 416 Mass. 62, 77 (1993) (security in convenience store); Sharpe v. Peter Pan Bus Lines, 401 Mass. 788, 793 (1988) (bus terminal); Mullins v. Pine Manor College, 389 Mass. 47, 51 (1983) (college campus); Missett v. Cardinal Cushing High School, 43 Mass.App.Ct. 5, 8 (1997) (high school dance); McLaughlin v. Vinos, 39 Mass.App.Ct. 5, 6-7 (1997) (parking garage); see Dennis v. Consolidated Rail Corp., 1998 WL 1181677 (Mass.Super. 1998; Fabricant, J.) (expert testimony required to support allegation of negligent security in commuter rail station).
Morgan was not shown to have known of the 1990 DPPC report. This obviates any issue concerning whether that report, if Morgan had known about it, should have triggered further inquiry, or a different placement decision, or greater supervision or security (as to any of which, expert testimony would be required).
The testimony of the plaintiffs sister, that the plaintiff felt scared and unsupervised and that she complained to Morgan about it before the assaults, would establish notice to Morgan, but does not fill the gap in the evidence pertaining to the standard of care.
Taken as a whole, then, and viewed in the light most favorable to the plaintiff, the evidence would not warrant submission of the case to a jury on the issue of Morgan’s negligence.
ORDER
For the foregoing reasons, summary judgment is to enter for the defendant, dismissing the Complaint.

Dr. Kelly was not disclosed as a potential expert, either in the Joint Pretrial Memorandum filed on December 12, 2000, nor (it is represented) in answers to interrogatories. It appears that the first mention of him as a potential witness in this case is in plaintiffs counsel’s affidavit, served on August 21 and filed on September 12, 2002 as part of the opposition to this summary judgment motion. At that time, trial was set for October 15, 2002. The totality of the disclosure is as quoted in the body. There is no disclosure of Dr. Kelly’s qualifications (concerning which, however, I would take'judicial notice), or of the basis of his opinions. Most seriously: Dr. Kelly’s familiarity with Rash appears to result from services rendered in connection with prior court proceedings, in the course of which he apparently performed a competency evaluation. There is no indication whatever that Dr. Kelly is familiar with, or could base a standard-of-care opinion upon, what Morgan knew or should have known about Rash at the time it accepted him, or at the time of the assault.