Evelyn **HEINRICH** on Behalf of her husband George **HEINRICH,** Henry M. Sienkewicz, Jr. on behalf of his mother Eileen Rose Sienkewicz,[1] Plaintiffs,

v.

William H. **SWEET,** M.D., Trustee of the Lee Edward Farr Trust dated 1/11/71, as amended,[2] The Estate of Lee Edward Farr,[2] M.D., Associated Universities, Inc.,[2] Massachusetts General Hospital, Massachusetts Institute of Technology,[3] and the United States of America,[4] Defendants.

No. Civ.A. 97–12134–WGY.

United States District Court, D. Massachusetts.

Sept. 29, 2000.

---

1. This case originated as a putative class action, but class action status was denied. *See* Docket no. 271. The claims of the originally-named plaintiffs Joseph Mayne and Walter Carl Van Dyke were dismissed pre-trial. *See* Docket no. 217. The claim of the later-added plaintiff, Marc Oddo, has been severed and proceeds as an independent action. *See* Docket nos. 335, 349.

2. All claims against each of these defendants were directed out of the case. *See* Docket no. 246.

3. The jury found for Massachusetts Institute of Technology upon all claims. *See* Docket no. 268.

4. The Court granted the United States' motion for judgment pursuant to the Federal Tort Claims Act's government contractor exception in an opinion dated February 9, 2000. *See Heinrich v. Sweet,* 83 F.Supp.2d 214, 224 (D.Mass.2000).

John M. Clifford, Bill P. Garde, Clifford, Lyons & Garde, Washington, DC, Mark A. Freeman, Martin H. Freeman, Freeman & Freeman, Rockville, MD, Raymond J. Heslin, Rubin, Baum, Levin, Constant & Friedman, New York, NY, John K. McGuire, Jr., McGuire & McGuire, Worcester, MA, Anthony Z. Roisman, Lyme, NH, for Plaintiffs.

Gail A. Anderson, Joseph L. Dougherty, Jr., Raymond J. Kenney, Christopher J. Maley, Martin, Magnuson & Kenney, Boston, MA, Constantine Athanas, Francis C. Lynch, Lori B. Silver, Palmer & Dodge, Thomas P. Billings, Karen White Salon, Sally & Fitch, Boston, MA, Garrett Harris, Sally VanderWeele, Gallagher & Gallagher, Charlestown, MA, Jerome A. Karnick, Jonathan Silverman, Kevin T. Van Wart, Mark J. Zwillinger, Kirkland & Ellis, Chicago, IL, William Shields, Day, Berry & Howard, Boston, MA, Burke M. Wong, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### INTRODUCTION

The principal events in this case took place during the 1950s and 1960s. Against all odds, the plaintiffs Evelyn Heinrich ("Heinrich") and Henry M. Sienkewicz ("Sienkewicz") (collectively "the Plaintiffs"), after protracted pre-trial proceedings,[5] eventually brought the defendants William Sweet, M.D. ("Sweet") and Massachusetts General Hospital ("Mass General") (collectively "the Defendants") to bay before a jury of the people. After twenty days of trial, the jury awarded Heinrich $250,000 in compensatory damages on her negligence claim and $250,000 on her wrongful death claim against both Defendants and awarded punitive damages of $750,000 against Sweet and $1,250,000 against Mass General. The jury awarded Sienkewicz $500,000 in compensatory damages on his negligence claim and $2,000,000 on his wrongful death claim against both Defendants and awarded punitive damages of $1,000,000 against Sweet and $2,000,000 against Mass General. Now the question is whether the Plaintiffs can hang onto these verdicts.

This opinion addresses three post-trial issues—the "Motion for Reduction of Jury Verdict in Accordance with Mass.Gen. Laws c. 229, § 2 (1958 ed.)," Mass General's contention that it is not vicariously liable for the actions of Sweet, and Mass General's "Motion for Judgment as a Matter of Law upon the Issue of Charitable Immunity." Each of these issues is addressed in turn.

### ANALYSIS

A. Motion for Reduction of Jury Verdict

Sweet and Mass General make two distinct arguments that are closely intertwined. Both contentions require this Court to determine whether the wrongful death statute applicable to this case is the one that was in existence at the time of the

---

5. This action has already been the subject of four written opinions. A more detailed account of the facts can be found in those opinions. See Heinrich v. Sweet, 44 F.Supp.2d 408 (D.Mass.1999) ("Heinrich I"); Heinrich v. Sweet, 49 F.Supp.2d 27 (D.Mass.1999) ("Heinrich II"); Heinrich v. Sweet, 62 F.Supp.2d 282 (D.Mass.1999) ("Heinrich III"); Heinrich v. Sweet, 83 F.Supp.2d 214 (D.Mass.2000) ("Heinrich IV").

deaths of Heinrich's husband and Sienkewicz' mother (the 1961 statute), or the one that was in place at the time the tortious conduct was discovered (the current statute). First, the Defendants argue that Heinrich's and Sienkewicz' damages should be limited to those contained in the 1961 statute and not the more sweeping damages available in the current statute. Second, they contend that the 1961 statute had a one-year statute of limitations that bars the present action.

### 1. Previous Rulings

Because all the parties either rely on or take issue with this Court's previous conclusions regarding the applicable statute and statute of limitations issues, a brief review is necessary.

In *Heinrich I*, the Court addressed the Federal Tort Claims Act claims, specifically the jurisdictional bar contained in 28 U.S.C. § 2401(b). Section 2401(b) provides that a tort action against the United States is forever barred unless "it is presented in writing to the appropriate Federal agency within two years after such claim accrues...." 28 U.S.C. § 2401(b). The issue before the Court was when the claim accrued.

The Court noted that the time of accrual was a question of federal law under the Act. *See Heinrich I,* 44 F.Supp.2d at 415 n. 8. Although the general rule is that a claim accrues at the time of injury, the Court relied on a Supreme Court decision and applied the discovery rule under federal law. Pursuant to the discovery rule analysis, the claims against the United States were tolled until the plaintiffs discovered or reasonably should have discovered the tortious conduct. *See id.* at 415. Thus, the procedural bar created by the tort claims act statute of limitations was hurdled.

In the next opinion, the Court addressed the statute of limitations for the other federal claims. Because the other federal causes of action did not have an express statute of limitations period, the Court

"borrowed" from state law. Accordingly, the Court turned to Mass.Gen.Laws ch. 260, § 2A which provides that actions of tort "shall be commenced only within three years next after the cause of action accrues." Mass.Gen.Laws ch. 260, § 2A. Because the claims were under federal law, the Court again relied on federal law to determine when the cause of action accrued and held, as it did in *Heinrich I,* that the claims were timely pled. *See Heinrich II,* 49 F.Supp.2d at 36–37.

Significant to the discussion here, the Court dismissed Mass General's assertion that the Court ought look to the statute of limitations statute in effect between 1951 and 1961 because that was when the injuries occurred. *See id.* at 36 n. 9. The Court concluded that it would apply the statute of limitations in effect when the cause of action arose. Because "the federal causes of action in these cases did not 'arise' or 'accrue' until 1995, when the Plaintiffs became aware of the alleged true nature of the experiments," the Court relied on the most recent statute. *Id.* Important to the discussion ahead is that the Court treated the words "arise" and "accrue" as synonymous.

In the third opinion, the Court addressed the statute of limitations defense as it related to the various state law claims. *See Heinrich III,* 62 F.Supp.2d at 304–05. Under Massachusetts law, the Court concluded that the statute of limitations had been tolled by both the doctrine of fraudulent concealment contained in Mass.Gen.Laws ch. 260, § 12 and the discovery rule, which was added to the wrongful death statute by amendment in 1989. *See Heinrich III,* 62 F.Supp.2d. at 305.

As to fraudulent concealment, the Court relied on the fiduciary duty imposed on doctors to disclose known possible causes of actions to patients fully. *See id.* Because the Massachusetts' plaintiffs alleged that "they did not gain actual knowledge of the 'true nature' of the [boron neutron

capture therapy] experiments until 1995, ... their claims [were] not time-barred under Massachusetts law." *Id.*

Additionally, the Court addressed the retroactive application of the discovery rule to the claims asserted under the Wrongful Death Statute. *See id.* at 305. Mass General pointed out that the statute in effect at the time of the death did not contain a discovery tolling provision. The Court concluded, however, that the 1989 amendment to the Wrongful Death Statute applied retroactively to deaths that occurred prior to the amendment but were discovered after the amendment was in effect. *See id.* Thus, the Plaintiffs' Massachusetts claims were also saved by the discovery rule.

Equally important, during the conference concerning the preliminary charge to the jury, the Court explicitly stated that the 1995 version of the Massachusetts Wrongful Death Statute applied:

> The death statute is procedural. The version of the wrongful death statute that governs is the version at the time the cause of action accrued, not at the time the injections took place. That is, it's the more recent version of the wrongful death statute we're going to use, the one without the limitation and, the limitation on punitive damages.

Sweet's Mem. in Supp. of Mot. for Reduction of Jury Verdict at 4 (quoting Tr. of Proceedings, Sept. 10, 1999 at 3–4).

In accordance with the construction thus adopted, the factual aspects of the statute of limitations question were presented to the jury. The jury determined that the statute of limitations had been tolled and that the action was timely brought. The Defendants failed to object to the instructions provided to the jury and a review of the jury instructions indicates that they were consistent with Massachusetts law.

### 2. Applicable Statute

The question remains: did the Court apply the right statute? Answering this question drastically affects the liability of the Defendants. The Court, discussing the federal claims in *Heinrich II*, stated that it would apply the statute of limitations in effect when the action "arises" or "accrues." *See Heinrich II*, 49 F.Supp.2d at 37 n. 9. Relying on the discovery rule and the doctrine of fraudulent concealment, the Court determined that the action accrued in 1995, when the plaintiffs discovered the tortious conduct. Based on this conclusion, the Court later applied the damage provisions available in the current wrongful death statute. In this case, the Court's determination of whether the discovery rule should be retroactively applied has a substantial impact on the extent of the liability of these Defendants. The Court's analysis needs to be revisited in light of the current motion. *Cf. Carter v. Supermarkets Gen. Corp.*, 684 F.2d 187, 191 n. 9 (1st Cir.1982) (when a statute of limitations does not affect defendant's liability, it may be treated retroactively), *disagreed with on other grounds by Burnett v. Grattan*, 468 U.S. 42, 46 n. 9, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984).

#### a. The Wrongful Death Statute

■ In 1961, the Massachusetts Wrongful Death Statute provided:

> A person who (1) by his negligence causes the death of a person in the exercise of due care, or (2) by wilful, wanton or reckless act causes the death of a person ... shall be liable in damages in the sum of not less than two thousand nor more than twenty thousand dollars, to be assessed with reference to the degree of his culpability.... Damages under this section shall be recovered in an action of tort by the executor or administrator of the deceased. No recovery shall be had under this section for a death which does not occur within two years after the injury which caused the death. An action to recover damages under this section shall be commenced within one year from the date of death or within such time thereafter as is provided by sections four,

four B, nine or ten of chapter two hundred and sixty.

Mass.Gen.Laws ch. 229, § 2 (1958 ed.). If this is the proper statute, the Court must cap the damages [6] and apply the one-year statute of limitations, which is triggered by the death and tolled only by the provisions of chapter 260, in this case fraudulent concealment.

The wrongful death statute went through a variety of permutations through the years. *See, e.g.,* Gen.Ct. of Mass. ch. 506 (1947); Gen.Ct. of Mass. ch. 427 (1949); Gen.Ct. of Mass. ch. 238 (1958); Gen.Ct. of Mass. ch. 666 (1967). Each change was accompanied by a specific effective date. For example, in 1962 the Massachusetts legislature raised the minimum and maximum amount of damages from $2000 and $20,000 to $3,000 and $30,000 respectively, *see* Gen.Ct. of Mass. ch. 306, § 1 (1962), and interestingly, the legislature was very specific regarding the applicability of the amendment. "This act shall take effect on [Jan. 1, 1963] and shall apply only to actions for death resulting from injuries sustained or accidents occurring on or after said·date." *Id.* § 2. In order to avoid confusion, the legislature also emphasized that "[t]he provisions of law ... in effect from time to time prior to the effective date of this act, shall continue to be applicable to such actions resulting from injuries which were sustained or accidents which occurred prior to the effective date of this act...." *Id.* This careful recitation, or some form of it, was present in all the amendments prior to the 1973 amendment.

In 1973, the legislature radically changed the damages allowed under the statute and slightly altered the statute of limitations. *See* Gen.Ct. of Mass. ch. 957 (1973). One change shifted the damage award from purely punitive damages to both punitive and compensatory damages. *See MacCuish v. Volkswagenwerk A.G.,* 22 Mass.App.Ct. 380, 394 n. 19, 494 N.E.2d 390 (1986), *aff'd,* 400 Mass. 1003, 508 N.E.2d 842 (1987) (noting that, in 1973, "the Governor favored the proposed legislation insofar as it provided that recovery for wrongful death, which up to that time was determined on a punitive basis, would be compensatory").[7] The other, more significant change, removed the cap on punitive damages that had been present since the statute's inception in 1898. *See id.* at 399 n. 27, 494 N.E.2d 390. In addition, the limitations period was extended from two years to three years. *See* Gen.Ct. of Mass. ch. 957, § 1 (1973). The 1995 version applied by the Court in this case reflects these changes:

A person who ... causes the death of a person, ... shall be liable in damages in the amount of: (1) the fair monetary value of the decedent to the persons entitled to receive the damages ... including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent ...; (2) the reasonable funeral and burial expenses of the decedent; (3) punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant.... An action to recover damages under this section shall be commenced within three years from the date of death....

---

6. Actually, the error goes deeper because the jury was never instructed to assess damages based on culpability. As a practical matter, however, the Defendants, wisely pursuing an intelligent cost-benefit analysis, seek not a new trial but a reduction in the wrongful death damages to the $20,000 statutory maximum contained in the 1961 version of the statute.

7. Contrary to the Defendants' position that there were no punitive damages allowed under the wrongful death statute, the damages were viewed as entirely punitive. The statutory cap, however, limited liability.

Mass.Gen.Laws ch. 229, § 2 (1995). Unlike the earlier amendments, it was determined in the 1973 amendment that "[t]his act shall take effect on [Jan. 1, 1974], and shall apply to causes of action arising on or after said date." Gen.Ct. of Mass. ch. 957, § 2 (1973). Thus, whether the 1973 damage provisions apply to the Plaintiffs depends on whether their cause of action for wrongful death "arose" in 1961, at the time of their deaths, or after January 1, 1974, when the tortious conduct was discovered.

As already discussed, this Court determined that the "causes of action in these cases did not 'arise' or 'accrue' until 1995, when the Plaintiffs became aware of the alleged true nature of the experiments." *Heinrich II,* 49 F.Supp.2d at 37 n. 9; *see Heinrich III,* 62 F.Supp.2d at 305 (stating that discovery rule analysis under federal law "applies with equal force under Massachusetts discovery rule principles"). This conclusion came, in part, from the retroactive application of the discovery rule that was added to the wrongful death statute by a 1989 amendment. The amended statute has since provided:

> An action to recover damages under this section shall be commenced within three years from the date of death, or within three years from the date when the deceased's executor or administrator knew, or in the exercise of reasonable diligence, should have known of the factual basis for a cause of action. . . .

Mass.Gen.Laws ch. 229, § 1 (2000); *see* Gen.Ct. of Mass. ch. 215 (1989). It is recognized that the discovery rule delays accrual until discovery. *See Pobieglo v. Monsanto Co.,* 402 Mass. 112, 116, 521 N.E.2d 728 (1988). While this Court used the word "accrue" and "arise" synonymously, *see Heinrich II,* 49 F.Supp.2d at 37 n. 9, it is not clear that this was precise. If it is, the retroactive application of the discovery rule has a significant impact on the substantive rights of the defendant. *See Fontaine v. Ebtec Corp.,* 415 Mass. 309, 319–20, 613 N.E.2d 881 (1993). In

*Fontaine,* the Supreme Judicial Court stated:

> [W]e have recognized that legislation limiting or increasing the measure of liability, while arguably remedial in the broad sense of that word, generally is considered to impair the substantive rights of a party who will be adversely affected by the legislation. In the absence of a provision mandating retrospective application, we have not assumed that such legislation applies to claims arising prior to enactment.

*Id.* at 319, 613 N.E.2d 881. Thus, a discussion of the power of word choice is in order.

### b. Arise, Accrue—What's the Difference?

It is true that, at times, Massachusetts courts have used the terms arise and accrue interchangeably, as this Court did in *Heinrich II.* According to *Black's Law Dictionary,* however, there is a subtle, yet important, difference between the two words. "Accrue" means "[t]o come into existence as an enforceable claim or right." *Black's Law Dictionary* 21 (7th ed.1999). In contrast, "arise" means "[t]o originate" as in "a federal claim arising under the U.S. Constitution." *Id.* at 102. Thus, based solely on the legal definitions, it appears that the Plaintiffs' claims originated or arose under the 1961 statute but did not accrue or come into existence until discovery in 1995. In any event, while *Black's* is a starting point, this Court ultimately must rely on Massachusetts law.

Massachusetts courts consistently apply the statute in effect at the time of death, even if the statute of limitations was tolled. *See Gaudette v. Webb,* 362 Mass. 60, 63, 284 N.E.2d 222 (1972); *Bickford v. Furber,* 271 Mass. 94, 97, 170 N.E. 796 (1930), *overruled in part on other grounds by Gaudette,* 362 Mass. at 63, 284 N.E.2d 222; *Jenkins v. Jenkins,* 15 Mass.App.Ct. 934, 935, 444 N.E.2d 1301 (1983) (rescript opinion); *Gouras v. Barchi,* 5 Mass.App.Ct. 845, 846, 364 N.E.2d 213 (1977) (rescript

opinion); *see also Anderson v. W.R. Grace & Co.,* 628 F.Supp. 1219, 1225 n. 2 (D.Mass.1986) (Skinner, J.); *Ellis v. Ford Motor Co.,* 628 F.Supp. 849, 852 (D.Mass. 1986) (Freedman, J.).

■ Further, a tolling provision, whether it be fraudulent concealment or the discovery rule, does not alter the date on which the action arose. The court's analysis in *Ellis* is instructive on this point. In *Ellis,* the court was faced with two plaintiffs that died as a result of a car accident that occurred in 1973. *See Ellis,* 628 F.Supp. at 851. Janet Parker died instantaneously; however, Robert Parker did not die of the injuries sustained in the accident until 1983. *See id.* A cause of action to recover for both deaths was brought in 1983. The court engaged in two distinct analyses based on the differing dates of death. *See id.* at 852, 859. As to Janet Parker, the court applied the 1973 statute to the claims brought on behalf of her children. In 1973, the wrongful death statute provided that an action must be commenced within one year of the date of death. *See id.* at 859. While the eleven-year delay obviously exceeded the one-year statute of limitations, the court held that it had been tolled by the minority of the children. *See id.* at 860. Significantly, the tolling provision relied on by the court did not change the time in which the action "arose." The tolling provision simply stopped the running of the statute of limitations contained in the 1973 statute.

Moreover, the Massachusetts courts have declined to apply the 1973 amendment retroactively to deaths occurring prior to its effective date. *See Owen v. Meserve,* 381 Mass. 273, 276, 408 N.E.2d 867 (1980); *Minkley v. MacFarland,* 371 Mass. 891, 891, 356 N.E.2d 1391 (1976) (rescript opinion); *Gouras,* 5 Mass.App.Ct. at 846, 364 N.E.2d 213. In *Minkley,* an action was brought by the decedent's wife following his death on August 16, 1973— four months prior to the effective date of the amendment. The family sought compensatory and punitive damages. The Su-

preme Judicial Court declined to recognize the compensatory damages as part of the statutory claim. In rejecting the claim, it limited its holding, stating "[n]othing we say here as to actions for wrongful death is applicable to claims arising on or after January 1, 1974." *Minkley,* 371 Mass. at 891, 356 N.E.2d 1391; *see also Owen,* 381 Mass. at 276, 408 N.E.2d 867 ("The governing statute in Massachusetts in 1971 defined the beneficiaries of such recovery, fixed maximum and minimum dollar amounts, and provided for assessment of damages with reference to the degree of the defendant's culpability."); *Gouras,* 5 Mass.App.Ct. at 846, 364 N.E.2d 213 ("Inasmuch as the cause of action here arose prior to the effective date of the amendment of G.L. c. 229, s. 2, by St.1973, c. 699, that statute has no application in this case.").

In addition, outside the context of the wrongful death statute, it is evident that both the courts and the legislature recognize the difference between "accrue" and "arise." *See* Mass.Gen.Laws ch. 258, § 4; *George v. Town of Saugus,* 394 Mass. 40, 41, 474 N.E.2d 169 (1985). In *George,* the Supreme Judicial Court was faced with distinguishing "accrue" from "arise" in the context of the Massachusetts Tort Claims Act. The Act provided that an action against a public employee was barred unless "the claimant shall have first presented his claim ... within two years after the date upon which the cause of action arose...." Mass.Gen.Laws ch. 258, § 4. Additionally, a civil action was barred if it was "brought more than three years after the date upon which such cause of action accrued." *George,* 394 Mass. at 41 n. 1, 474 N.E.2d 169. The plaintiff, a minor at the time of the injury, failed to present her claim until she reached the age of majority, nearly three years later. She sought to apply the tolling provisions for minors to the presentment requirement. The Supreme Judicial Court refused, instead holding that the statute required presentment to be made within two years of the

injury—the date on which the action arose. In contrast, the date of accrual, triggering the three-year statute of limitations, was delayed until majority. *See id.* at 42 n. 3, 474 N.E.2d 169.

Thus, there is ample evidence within Massachusetts statutes and case law to support a conclusion that "arise" and "accrue" are distinct concepts that bring different meaning to a statute. A review of the law reveals that the Court erred in its previous analysis. Based on the foregoing, this Court rules that the Plaintiffs' claims for wrongful death arose in 1961, even if they accrued at a later date. Accordingly, the damage provisions in the 1961 statute are applicable. Damages under the wrongful death statute are limited to twenty thousand dollars.

### 3. Tolling

Not content, Sweet and Mass General contend that the one-year statute of limitations contained in the earlier wrongful death statute bars all recovery.

▆ The next step in the analysis is thus to determine whether the one-year statute of limitations was tolled by an applicable tolling provision. In *Heinrich III,* the Court ruled that the statute of limitations was tolled by fraudulent concealment. *See Heinrich III,* 62 F.Supp.2d at 304. In addition, the Court applied the discovery rule, added to the Wrongful Death Statute in 1989, retroactively. *See id.* at 305. As a result, the statute was tolled until, at the earliest, 1995. Sweet and Mass General challenge both grounds. *See* Defs.' Mem. in Supp. of Mot. for a New Trial at 14; Defs.' Mem. in Supp. of Renewed Mot. for J.N.O.V. at 18.

▆ Chapter 260, section 12 provides:

If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

Mass.Gen.Laws ch. 260, § 12. In general, this statute requires a plaintiff to show an affirmative act of fraudulent concealment on the part of the defendant. *See Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 130 (1st Cir.1987). But in cases in which "a fiduciary relationship exists between plaintiff and defendant [the] mere failure to reveal information may be sufficient to constitute fraudulent conduct for the purposes of section 12." *Id.; see also Puritan Med. Ctr., Inc. v. Cashman,* 413 Mass. 167, 176, 596 N.E.2d 1004 (1992). The Massachusetts courts have held that "[f]or some purposes (e.g., treatment) the doctor-patient relationship is a fiduciary one, ... and there may be some circumstances where there is a duty to disclose a cause of action." *Fowles v. Lingos,* 30 Mass.App. Ct. 435, 441, 569 N.E.2d 416 (1991) (citations omitted). In addition, a physician has a duty of full disclosure under the doctrine of informed consent to alert a patient of the material risks and alternatives to a chosen course of action. *See Bourassa v. LaFortune,* 711 F.Supp. 43, 47 (D.Mass.1989) (Harrington, J.); *Harnish v. Children's Hosp. Med. Ctr.,* 387 Mass. 152, 155–56, 439 N.E.2d 240 (1982). Thus, under Massachusetts law, silence can be the equivalent of fraudulent concealment.

Moreover, the Supreme Judicial Court has held that:

An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G.L. c. 260, § 12. Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary. The plaintiff is not required to have made an independent investigation.

*Demoulas v. Demoulas Super Mkts., Inc.,* 424 Mass. 501, 519–20, 677 N.E.2d 159 (1997) (citation omitted). The law, therefore, places the burden on the fiduciary to disclose the referent facts.

In *Heinrich III,* the Court ruled that "[t]he Massachusetts Plaintiffs need only show that the private defendants failed to disclose the facts which give rise to a possible cause of action, and that the Massachusetts Plaintiffs did not otherwise gain knowledge of those facts at an earlier time...." *Heinrich III,* 62 F.Supp.2d at 304. In general, this statement is true in fiduciary relationships. In the context of the doctor-patient relationship, however, the Massachusetts courts have developed a slightly different standard. The Supreme Judicial Court, in *Maloney v. Brackett,* 275 Mass. 479, 176 N.E. 604 (1931), ruled that there must be some evidence that "the defendant knew or believed" that she had breached her professional duty. *Id.* at 484, 176 N.E. 604. This Court acknowledged this when it stated "Massachusetts imposes a fiduciary duty on doctors to disclose *known* possible causes of action to patients." *Heinrich III,* 62 F.Supp.2d at 304 (emphasis added). In support of its analysis, this Court cited *Bourassa v. LaFortune,* 711 F.Supp. 43 (D.Mass.1989). *See id.*

Sweet and Mass General claim that this Court's reliance on *Bourassa* is misplaced because the Massachusetts Appeals Court declined to adopt its holding in *Fowles v. Lingos,* 30 Mass.App.Ct. 435, 437, 569 N.E.2d 416 (1991). According to the defendants, "[t]o date, no Massachusetts Court has found sufficient facts to impose an affirmative duty of disclosure for purposes of fraudulent concealment in the context of a doctor-patient relationship." Defs.' Mem. in Supp. of Renewed Mot. for J.N.O.V. at 18. The preceding statement is accurate, but the Court disagrees with the defendants' assessment of the dissonance between *Fowles* and *Bourassa.*

Both *Fowles* and *Bourassa* relied on the Supreme Judicial Court's decision in *Maloney* to establish the standard of disclosure in a doctor-patient relationship. *See Fowles,* 30 Mass.App.Ct. at 440–41, 569 N.E.2d 416; *Bourassa,* 711 F.Supp. at 47. In the context of fraudulent concealment,

the Supreme Judicial Court stated that "the failure of a doctor to disclose a cause of action to a patient could not be found to be a breach of his professional duty without evidence that he knew or believed ... he had performed or assisted in the performance of an unnecessary operation...." *Maloney,* 275 Mass. at 484, 176 N.E. 604. Thus, the Supreme Judicial Court required that there be evidence that the doctor knew or believed that she had erred.

The *Fowles* court had no evidence before it that a cause of action had been known. Indeed, there was a strong difference of opinion regarding whether the doctor had even acted negligently. According to the court in *Fowles,* "[a] plaintiff does not establish fraudulent concealment ... 'by showing only that there is a difference of opinion concerning the applicable standard of care.'" *Fowles,* 30 Mass.App.Ct. at 441, 569 N.E.2d 416 (quoting *Geisz v. Greater Baltimore Med. Ctr.,* 313 Md. 301, 330, 545 A.2d 658 [1988]).

In *Bourassa,* the court concluded that, based on the language of *Maloney,* "if a doctor knows or believes that a cause of action exists and fails to disclose it to the plaintiff, he will have breached his fiduciary relationship ... thus tolling the statute of limitations." *Bourassa,* 711 F.Supp. at 47. Given the facts before it, the court ruled that there was sufficient evidence to overcome summary judgment on a statute of limitations defense. *See id.* at 48.

The Massachusetts Court of Appeals, in *Fowles,* distinguished the facts in *Bourassa* from those before it: "We do not know what material concerning that issue was before the judge in *Bourassa.* What was here presented to show fraudulent concealment was insufficient...." *Fowles,* 30 Mass.App.Ct. at 441, 569 N.E.2d 416. The court went on to note that "[t]he facts in this case are distinguishable from those in *Bourassa.*" *Id.* at 442 n. 9, 569 N.E.2d 416. Implicit in the court's language in *Maloney* and consistent with *Fowles* is that "if evidence had been presented tend-

ing to prove that the defendants did not believe in good faith that the plaintiff's operation was advisable, the court would have ruled differently." *Bourassa,* 711 F.Supp. at 47.

In addition, because the retroactive application of the discovery rule does not affect the substantive rights of the defendants, the statute of limitations was tolled by the discovery rule as well. *See Carter,* 684 F.2d at 191 n. 9 ("Massachusetts follows the general rule that, absent clear legislative intent, statutes affecting substantive rights are prospective, whereas statutes affecting procedure or remedies may be retroactive."). It has been held that the discovery rule establishes the date of accrual. *See Pobieglo v. Monsanto Co.,* 402 Mass. at 117, 521 N.E.2d 728. Because the date of accrual and the date the action arose can be different dates, the retroactive application of the discovery rule amendment does not influence the Court's conclusion regarding the applicable statute for damages. As a result, the Court's reasoning in *Heinrich III,,* retroactively applying the discovery rule, 62 F.Supp.2d at 305, remains intact.

More important at this juncture of the proceedings is the jury's findings. The statute of limitations question was ultimately presented to the jury. The Defendants did not object to the Court's jury instructions at the time of the charge, nor do they quarrel with them in their current papers. The jury found that the statute of limitations had been tolled. The jury charge accurately reflects the law as interpreted by this Court.

Mass General suggests that because the jury found for the Defendants as to informed consent, it was inconsistent to find that the statute of limitations was tolled by fraudulent concealment. Its analysis, however, confuses two distinct concepts. A doctor could inform a patient of all the risks of a procedure as well as the uncertainty of the outcome but nonetheless fail to disclose that the procedure itself was negligent or the manner in which it was performed was negligent. Implicit in the doctor-patient relationship is an understanding that the doctor is acting in the best interest of the patient and within the bounds of medical ethics. While Dr. Sweet may have informed the Plaintiffs that the treatment was risky and uncertain, he failed to disclose that performing the experiments on human beings was negligent. This is what the jury found, and it is consistent.

Accordingly, the motion of Sweet and Mass General to reduce the jury verdict is ALLOWED and, upon this cause of action, Sweet is adjudged liable for punitive damages alone in the amount of $20,000—the maximum the Massachusetts Wrongful Death Statute would allow at the time the Plaintiffs' wrongful death cause of action arose. Mass General would stand in the same position save that it now trims its sails in an attempt to claw its way free altogether.

## B. Vicarious Liability

In an attempt to divorce itself completely from any responsibility, Mass General argues that the evidence was insufficient for it to be held liable for the conduct of Sweet. *See* Mass General's Mem. in Supp. of Mot. for J. on Charitable Immunity at 17. In a conclusory two-paragraph argument, Mass General "submits that the evidence presented at trial did not satisfy the plaintiff's burden of proving an agency relationship between Dr. Sweet and [Mass General]." *Id.* at 18.

The vicarious liability of hospitals for the negligent act of a physician is slightly different than that applied to standard employer-employee relationships under Massachusetts law. *See Miller v. Kurkjian,* No. CIV.A. 95–1723B, 1999 WL 176911, at *2–*5 (Mass.Super. Feb. 23, 1999) (Gants, J.) (describing the evolution of vicarious liability in Massachusetts). In general, control of an agent's activities has been the guiding principle in deciding cases that involve an assertion of vicarious liability.

*See Kelley v. Rossi*, 395 Mass. 659, 662–63, 481 N.E.2d 1340 (1985) *called into doubt on other grounds by Miller*, 1999 WL 176911, at *6–*7. Initially, the Supreme Judicial Court construed the term "control" narrowly, limiting it to instances in which the employer had the "right of control" over the specific conduct in question. *See Khoury v. Edison Elec. Illuminating Co.*, 265 Mass. 236, 238–39, 164 N.E. 77 (1928), *overruled in part by Konick v. Berke, Moore Co.*, 355 Mass. 463, 468, 245 N.E.2d 750 (1969). According to the court, "the employee must be subject to control by the employer, not only as to the result to be accomplished but also as to the means to be used." *Khoury*, 265 Mass. at 238, 164 N.E. 77. Thus, it was possible "for a person [to] be an agent or a servant as to one part of an undertaking, and an independent contractor as to other parts." *Id.* at 239, 164 N.E. 77.

Later, the Supreme Judicial Court broadened the scope of acts included within vicarious liability. *See Konick*, 355 Mass. at 468, 245 N.E.2d 750. Instead of requiring the employer to have control over the precise conduct, liability was found whenever there was an employer-employee relationship and the negligent act was within the scope of the employment. *See id.* at 467–68, 245 N.E.2d 750. In essence, the "right of control" over the conduct was inferred if the employee was acting "in furtherance of the master's business." *Id.*

Although the change in *Konick* appears semantic, the effect is dramatic when the opposing outcomes in the almost identical fact scenarios of *Khoury* and *Konick* are compared. In both instances, an employee was using a personal vehicle to perform company business with the permission of the employer. In *Khoury* the court concluded that there was no vicarious liability because the employer did not have any control over the employee in the operation of the car or in the car's condition. *See Khoury*, 265 Mass. at 239–40, 164 N.E. 77. In contrast, in *Konick*, the court applied the broader definition of "control" and concluded that even though the employer did not have control over the employee's operation of the car, liability existed because he was acting "in relation to his duties" to the employer. *Konick*, 355 Mass. at 468, 245 N.E.2d 750.

It does not appear, however, that the *Konick* definition extended to physicians. "Because of the high level of skill involved in the practice of medicine, physicians have traditionally been viewed as independent contractors, allowing hospitals and other medical centers to remain exempt from liability for negligent acts of a physician." *Chase v. Independent Practice Ass'n, Inc.*, 31 Mass.App.Ct. 661, 665, 583 N.E.2d 251 (1991) (citing *Kelley*, 395 Mass. at 662, 481 N.E.2d 1340); *but see Miller*, 1999 WL 176911, at *7 (suggesting it is unclear what formulation of vicarious liability applies to physicians). Despite this broad statement, Massachusetts courts have been willing to hold hospitals or other health care facilities liable in some instances for the negligent conduct of a physician. *See Smith v. Steinberg*, 395 Mass. 666, 669, 481 N.E.2d 1344 (1985); *Kelley*, 395 Mass. at 664, 481 N.E.2d 1340; *McMurdo v. Getter*, 298 Mass. 363, 368, 10 N.E.2d 139 (1937). Even so, the test for vicarious liability in this context parallels the one first expressed in *Khoury* rather than *Konick*. In short, there has to be evidence that Mass General had control or the right of control over Sweet's *actual* conduct which is alleged to be negligent, namely the radiation experiments. *See Kelley*, 395 Mass. at 664, 481 N.E.2d 1340; *Harnish*, 387 Mass. at 159, 439 N.E.2d 240; *Chase*, 31 Mass.App.Ct. at 665, 583 N.E.2d 251. *But see Miller*, 1999 WL 176911, at *1–*7 (suggesting that broader formulation of vicarious liability will likely emerge).

There is ample evidence in the record that Mass General exercised or had the right to exercise control and direction over the radiation experiments. Mass General's approval was critical to the ability of Sweet to conduct the experiments. Dr.

Sweet made a formal request to use the facilities and reactor at M.I.T only "[a]fter extensive discussions with the appropriate authorities at the Massachusetts General Hospital. . . ." Trial Ex. 10 at 1. The request also stated that the experiments had been "approved at [Mass General] by the Surgical Executive Committee, the General Executive Committee of the Staff, and the Board of Trustees." *Id.* at 2 (internal citations omitted). These same committees also had assessed the "general problem of the responsibility of [Mass General] for its patients during the period they are at as well as travelling [sic] to and from the M.I.T. reactor. . . ." *Id.* Moreover, the General Director of Mass General, Dr. Clark, appointed a single individual, not Sweet, "with whom M.I.T. authorities may deal on administrative problems and in medico-legal implications of this work." *Id.* Implicit in the request is that access to the reactor would have been denied without the involvement and approval of Mass General.

The evidence described above is more than adequate to support the conclusion that Mass General exercised or had the right to exercise control and direction over the radiation experiments conducted by Sweet and other physicians at Mass General.[8] Mass General makes no attempt to rebut this evidence, nor does it present any case law that would require this Court to find this quantum of evidence lacking. Thus, this Court rules that the evidence presented was more than sufficient for Mass General to be held liable for the negligent actions of Sweet.

### C.   Charitable Immunity

Mass General maintains that complete charitable immunity under Massachusetts common law, as it existed at the time of the treatment, extinguishes its liability. *See* Mass General's Mem. in Supp. of Mot. for J. on Charitable Immunity at 6. The

Plaintiffs agree that the common law and not the statutory law is applicable and further contend that the Court must look to the charitable status of Mass General in 1960 and not its current charter to determine if immunity exists. *See* Pl.'s Opp'n to Mot. for J. Charitable Immunity at 1–2 n. 1. The parties' positions accord with Massachusetts case law.

Shortly after the 1971 enactment of the statute providing for limited charitable liability, Mass.Gen.Laws ch. 231, § 85K, the Supreme Judicial Court determined that this statute did not apply retroactively. *See Ricker v. Northeastern Univ.,* 361 Mass. 169, 172, 279 N.E.2d 671 (1972) ("We perceive no indication that [Mass. Gen.Laws ch. 231, § 85K] has, or was intended to have, any retrospective effect."); *see also Perloff v. Symmes Hosp.,* 487 F.Supp. 426, 429 (D.Mass.1980) (Zobel, J.) (statute had the effect of barring charitable immunity prospectively only); *Johnson v. Wesson Women's Hosp.,* 367 Mass. 717, 718, 328 N.E.2d 490 (1975) (statute abolishing charitable immunity is not retrospective in effect); *Higgins v. Emerson Hosp.,* 367 Mass. 714, 715, 328 N.E.2d 488 (1975) (same). Consequently, the statute does not apply to injuries that occurred prior to its effective date. *See Johnson,* 367 Mass. at 718, 328 N.E.2d 490; *Higgins,* 367 Mass. at 715, 328 N.E.2d 488. Because Heinrich and Sienkewicz both died prior to the statute's enactment, their claims are governed by the law as it existed at the time of their deaths. It follows logically that the Court would look to the charitable status of Mass General in 1960 to determine the applicability of charitable immunity. If Mass General has the benefit of the defense, it has *complete* immunity from liability.

### 1.   The Analysis

A review of the early case law explicating charitable immunity reveals that the

---

8.   The Plaintiffs also point to other evidence presented at trial that indicates an agency relationship between Sweet and Mass Gener-

al. *See* Pls.' Opp'n to Mot. for J. on Charitable Immunity at 14–16 (citing Trial Exs. 58, 61–64, 67, 71).

courts have struggled to define the exact parameters of the doctrine. After reviewing Massachusetts charitable immunity decisions, the First Circuit illustrated the doctrine of charitable immunity in the following manner:

*Mason v. Southern New England Conference Ass'n of Seventh–Day Adventists,* 696 F.2d 135, 140 n. 8 (1st Cir.1982). According to the First Circuit, the charitable exemption applies only when the activity in question is both charitable and not primarily commercial. *See id.*

This Court's review of the early Massachusetts case law accords, in most respects, with the First Circuit's analysis. What emerges, although not always clearly elucidated by the courts, is a burden-shifting paradigm. As charitable immunity is an affirmative defense, the defendant bears the burden of going forward with evidence sufficient to warrant the conclusion that it is a public charity. *See McDonald v. Massachusetts Gen. Hosp.,* 120 Mass. 432 (1876) ("The defendant was a public charitable institution under the laws of the Commonwealth."), *overruled in part on other grounds by Colby v. Carney Hosp.,* 356 Mass. 527, 528, 254 N.E.2d 407 (1969). The plaintiff, of course, can rebut this evidence or, alternatively, seek to shoulder the burden of going forward with either evidence that the defendant was acting outside its charitable corporate powers when the tort occurred, *see McKay v. Morgan Mem'l Co-Op Indus. & Stores, Inc.,* 272 Mass. 121, 123, 172 N.E. 68 (1930) (determining whether business conducted was to carry out charitable purpose as described in charter); *Holder v. Massachusetts Horticultural Soc'y,* 211 Mass.

370, 97 N.E. 630 (1912) (defendant used part of building where accident occurred "for purposes entirely disconnected with those for which the defendant was chartered"); *Mason,* 696 F.2d at 140 ("[W]e must therefore determine whether the Association's activity was within its corporate powers...."), or evidence that the activity was primarily commercial. *See McKay,* 272 Mass. at 125, 172 N.E. 68. The ultimate burden of persuasion rests on the defendant to establish the affirmative defense.

Describing the analysis is simpler than its actual application, however. Real life activities are not as easily categorized as either the First Circuit's table or this Court's burden-shifting paradigm suggest. Often, the factual predicate of a case crosses boundaries. It has been the unenviable task of the courts to establish either liability or immunity based on the unique facts and circumstances of a particular case.

■ A second, complicating factor is that even if the Plaintiffs present credible evidence that Mass General was acting outside its charitable corporate powers or that the activity was primarily commercial, the charitable immunity defense is not eliminated. Mass General is correct in contending that its Charter "is prima facie evidence of charitable purpose and operation...." *Barrett v. Brooks Hosp., Inc.,*

338 Mass. 754, 758, 157 N.E.2d 638 (1959), *overruled in part on other grounds by Colby,* 356 Mass. at 528, 254 N.E.2d 407; *see also Boxer v. Boston Symphony Orchestra, Inc.,* 339 Mass. 369, 372, 159 N.E.2d 336 (1959). Under Massachusetts law, it is well established that there is a difference between a presumption and prima facie evidence. *See Commonwealth v. Pauley,* 368 Mass. 286, 290–91, 331 N.E.2d 901 (1975); *Boxer v. Boston Symphony Orchestra, Inc.,* 342 Mass. 537, 538, 174 N.E.2d 363 (1961), *overruled in part on other grounds by Colby,* 356 Mass. at 528, 254 N.E.2d 407; *Salter v. Leventhal,* 337 Mass. 679, 696–97, 151 N.E.2d 275 (1958); *Cook v. Farm Serv. Stores,* 301 Mass. 564, 566–67, 17 N.E.2d 890 (1938). According to the Massachusetts view, a presumption is rebuttable and may be rebutted by evidence warranting a finding contrary to the presumed fact. Once rebutted, the presumption disappears and the party that was aided by the presumption is left with nothing more, perhaps, than an inference of a once presumed fact.

■ In contrast, prima facie evidence does not disappear, even in the face of evidence warranting a finding to the contrary. Prima facie evidence maintains its evidentiary force, remains in the case, and is accorded "such weight as the jury sees fit to give it." William G. Young et al., *Massachusetts Evidentiary Standards* 44 (2000); *see also* Paul J. Liacos et al., *Handbook of Massachusetts Evidence* § 5.5.3, at 230 (7th ed.1999). In other words, rebuttal evidence simply avoids a mandatory finding of charitable immunity, but it does not result in a mandatory finding that the defense is inapplicable. The applicability or inapplicability of the defense is a decision for the fact finder.

2. The Case Law and Its Application

Charitable immunity was based on the reasoning that it is improper to divert funds for tort judgments that were donated for charitable purposes. *See, e.g., Roosen v. Peter Bent Brigham Hosp.,* 235 Mass. 66, 68, 126 N.E. 392 (1920), *overruled in part on other grounds by Colby,* 356 Mass. at 528, 254 N.E.2d 407; *McDonald,* 120 Mass. at 432. This "trust fund" rationale did not extend, however, to liability for torts committed in the course of revenue-generating activities even if the money was to be applied to the charitable purpose. *See McKay,* 272 Mass. at 124, 172 N.E. 68; *Mason,* 696 F.2d at 139. When actually faced with factual situations that involved revenue production, the courts further refined the analysis to allow immunity if the revenue was produced only incidentally to some charitable activity. *See Boxer,* 342 Mass. at 539, 174 N.E.2d 363. . In addition, immunity was allowed for conduct that was only indirectly linked to an institution's charitable purpose but that was not for revenue production. *See Ricker,* 361 Mass. at 172, 279 N.E.2d 671.

The case law indicates that the protection afforded by charitable immunity is most often lost due to the commercial nature of an activity. Thus, courts have emphasized the First Circuit's "primarily commercial" box. According to the First Circuit, " 'directly' charitable activities are meant to be contrasted with those activities whose thrust is commercial, rather than with all the other forms of activities that may in some sense be only indirectly charitable." *Mason,* 696 F.2d at 139. What is obscured by this statement, and undeveloped by the case law, is the box labeled "non-charitable" by the First Circuit or, in this case, the availability of evidence that the institution acted ultra vires.

This undeveloped area of the law is exactly what is at issue here. The Plaintiffs do not attack Mass General's status as a charitable institution, nor do they argue that Sweet's research was primarily commercial. Instead, the Plaintiffs argue that Mass General was acting outside of its charitable purposes when it conducted the boron neutron experiments on human beings.

In response, Mass General properly argues that it has met its initial burden of production under the affirmative defense of charitable immunity. The burden of going forward is now on the Plaintiffs to present evidence that warrants a finding to the contrary. As already noted, however, evidence rebutting the prima facie case only avoids a mandatory finding that Mass General is protected by the charitable immunity doctrine, it does not automatically result in a finding for the Plaintiffs.

■ The parties dispute what rebuttal evidence is necessary. Mass General claims that the Plaintiffs must establish that the research was primarily commercial while the Plaintiffs contend that evidence that Mass General acted ultra vires will suffice. The language of the cases supports the Plaintiffs' averments that the charitable immunity defense can be rebutted by evidence that the charitable institution was acting ultra vires.

In *Reavey v. Guild of St. Agnes*, 284 Mass. 300, 187 N.E. 557 (1933), the Supreme Judicial Court declared that "[a] charitable corporation is not liable for negligence in the course of activities within its corporate powers carried on to accomplish directly its charitable purpose." *Id.* at 301, 187 N.E. 557 (1933). The court went on to find "[n]othing in the allegations shows that painting the defendant's building was not within its corporate powers." *Id.* at 303, 187 N.E. 557. The court separately addressed the issue of whether the painting was "primarily commercial." *Id.*

More than a decade later, the court again approached charitable immunity with a similar analysis. *See Carpenter v. Young Men's Christian Ass'n*, 324 Mass. 365, 370–71, 86 N.E.2d 634 (1949). In *Carpenter*, a young boy was injured at a playground owned and operated by the YMCA, an acknowledged charitable organization. It was undisputed that the playground was not a business enterprise for profit. *See id.* at 370, 86 N.E.2d 634. Even though the court determined that the YMCA was a charity and the activity was not primarily commercial, its analysis was not complete. The plaintiff contended that operation of the playground was outside the corporation's charitable purpose. The court concluded otherwise:

> Nor did the defendant lose its charitable character because of operating a playground for young children of both sexes, the while its statutory purposes were for the "purpose of improving the spiritual and mental condition of young men." Provided there is adherence in the main to the declared purpose of the charity, incidental variations do not destroy the right to exemption.

*Id.* at 371, 86 N.E.2d 634.

In *Barrett*, the court addressed which party had the ultimate burden of persuasion regarding whether the charitable organization was acting ultra vires. *See Barrett*, 338 Mass. at 757, 157 N.E.2d 638. The court concluded that once an organization established its charitable purpose through public documents it was not "incumbent upon that corporation [to shoulder] the further obligation to go on and prove ... it has not been operating ultra vires...." *Id.* Thus, the burden shifts to the plaintiff to introduce evidence of ultra vires activity. Again, as part of the analysis in *Boxer*, the court ruled "[t]here was no evidence to show that in any aspect the defendant in 1955 was acting beyond the scope of its charter...." *Boxer*, 342 Mass. at 538, 174 N.E.2d 363.

As the case law indicates, the Plaintiffs are not limited to presenting evidence that Mass General's activity was primarily commercial. Mass General may also lose its charitable immunity by acting beyond its corporate purpose. The question now becomes whether the Plaintiffs were injured during an activity which was within the scope of Mass General's charitable purpose. If the activity was beyond Mass General's corporate powers, then it may be subject to the ordinary rules of liability.

With the issue defined and the evidentiary framework established, the parties

circle, looking for a knock-out punch as matter of law. The Plaintiffs contend that medical research was not included in Mass General's Charter as it existed in 1960. The charitable purpose of the hospital was stated as "the maintenance of sick[,] poor and lunatic persons, who would otherwise be chargeable to the Commonwealth...." Pl.'s Mem. in Opp'n to Mot. for J. on Charitable Immunity App. I at 5. Mass General concedes that the "general charitable purpose of [Mass General] has always been to provide care to the sick" but argues that the "development of new potential treatment modalities ... is certainly in accordance with that purpose." Def.'s Mem. in Supp. of Mot. for J. on Charitable Immunity at 16.

The Plaintiffs counter that medical research is not an inherent part of the charitable activity of providing care to the sick and indigent. In order to support this assertion, they point to the 1977 Articles of Amendment which expanded Mass General's corporate purpose to include "educational activities and scientific research related to the care of such persons or to the promotion of health and the prevention of disease." Pl.'s Mem. in Opp'n to Mot. for J. on Charitable Immunity App. I at 17. According to the Plaintiffs, the amendment "would be surplusage and the words would have no force and effect" if Mass General's earlier Charter had already provided for such conduct. Id. at 6.[9]

Neither argument is without merit. Moreover, the indefinite posture of the law in this area makes analysis all the more difficult. How activity is characterized impacts the evaluation. Were the experiments, as Mass General asserts, a natural extension of the expressed charitable purpose of caring for the sick and insane? Or was the research, as Plaintiffs contend, outside the scope of the charitable purpose

because the Plaintiffs were used "in human experiments where there was no reasonable possibility of therapeutic benefit?" Id. at 5.

In general, Massachusetts courts have broadly construed stated charitable purpose. As the Supreme Judicial Court observed in Carpenter, as long as there is "adherence in the main to the declared purpose of the charity, incidental variations do not destroy the right to exemption." Carpenter, 324 Mass. at 371, 86 N.E.2d 634. It is not necessary for the activity explicitly to be expressed in the corporate charter to establish immunity if the activity fits within the "broad general purposes of the charter." Boxer, 342 Mass. at 539, 174 N.E.2d 363. For example, in Enman v. Trustees of Boston University, 270 Mass. 299, 170 N.E. 43 (1930), the court ruled that the maintenance of a dormitory fit within Boston University's educational purpose, see id. at 300, 170 N.E. 43. See also Ricker, 361 Mass. at 172, 279 N.E.2d 671. Thus, the Plaintiffs' reliance on the four corners of the charter is misplaced. The fact that research was explicitly added later does not exclude it from the original charitable purpose of caring for the infirm. To the contrary, research and medical care are closely intertwined. Medical advances are only possible because of the pioneering efforts of scientists and physicians.

Yet what has any of this to do with Mass General's conduct here? The jury never considered Mass General's charitable immunity defense. Indeed, all the parties and the Court kept deferring consideration of the charitable immunity defense until "later," believing that surely it could be resolved as matter of law. Neither party objected to the Court's jury instructions which did not address charitable immunity.

---

9. The charitable purposes of Brooks Hospital, as stated in Barrett, separately listed the provision of medical services for the sick and the promotion of treatment through "original research and laboratory investigations." Barrett, 338 Mass. at 757, 157 N.E.2d 638. While the court determined that research and laboratory investigations were of "charitable use," it is noteworthy, although not conclusive, that this purpose was separately set forth in the charter rather than assumed within the scope of medical treatment.

All parties elected to reserve resolution of this issue until post-trial. *Compare Ramos v. Davis & Geck, Inc.*, 224 F.3d 30, 32 (1st Cir.2000). Yet, even their post-verdict briefs are void of any reference to this procedural conundrum. This issue, however, cannot be resolved as matter of law. Fact finding is required. What now?

Fortunately, the Federal Rules of Civil Procedure lend guidance. Rule 49(a) provides:

> The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to makes its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives a right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding....

Fed.R.Civ.P. 49(a).[10] The First Circuit observed that when a party fails to request either a "special question" or an instruction submitting a particular theory to the jury, the "party makes a choice that has the associated consequence of almost certainly precluding the assertion after verdict of the omitted theory...." *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1555 (1st Cir.1994).

Here, the parties did not preclude the assertion of charitable immunity post-verdict. The parties, specifically Mass General, reserved its right to assert the theory once the verdict was obtained. What was waived, however, is the right to have the issue of charitable immunity decided by the jury. By electing to withhold submission of the theory to the jury, the parties have waived the right to a jury trial on this issue. Thus, the Court will make the findings necessary to resolve this issue.

Relying upon the same evidence that the Court earlier ruled sufficient as matter of law for the jury to find Mass General vicariously liable, the Court independently finds it liable for the actions of Sweet. Moreover, the Court finds that during the treatment of both Heinrich's and Sienkewicz's decedents, Sweet had actual knowledge of the imprecision of the localization of the boron injections to the cancerous brain tissue and the related imprecision of the neutron radiation, with the result that unacceptably high degrees of radiation necrosis were occurring in these and other of his patients. In short, Sweet well knew during his care of these patients that his BNCT treatments were not helping them, and, in fact, were causing severe side effects unrelated to the progressive effect of the fatal brain tumors. He pressed ahead anyway, believing in complete good faith that such experimentation on dying patients held out hope for other cancer victims.[11] However praiseworthy his goal, his conduct with respect to the patients involved here was, as the jury found, negli-

---

**10.** The Court recognizes that this is an imperfect solution to a difficult procedural question. The current posture of this case does not fit neatly into any one rule. Rule 49 offers the best option, both in policy and language. Rule 51 also offers an alternative. *See* Fed.R.Civ.P. 51. Neither party objected to the Court's instructions to the jury which omitted any consideration of the affirmative defense of charitable immunity. As a result, a party cannot now assign error to the omission. The parties do not suggest the Court erred, however. Thus, the election policy undergirding Rule 49 seemed the more fitting choice, the parties apparently making no objection to the Court's consideration and determination of the factual issues in this instance.

**11.** The most poignant of Sweet's medical hubris is found in the testimony of Marie Denning, Eileen Sienkwicz's sister. She testified that she visited her sister in Mass General shortly before the latter's death. She found her sister struggling feebly against the nurses, begging them not to give her any more boron neutron injections. *See* Tr. of Denning Trial Test. at 15:18–17:12. Marie Denning went to see Dr. Sweet and asked him to discontinue the treatments. *See id.* at 17:13–18:2. His response was to say "Your sister's been through a lot and for the good of mankind ... this will help." *Id.* at 17:23–24.

gent. While Mass General disagrees with these findings, they are amply warranted on the trial record. Vicarious negligence on the part of Mass General does not, however, strip it of its charitable immunity.

Moreover, Mass General points to the jury finding that held Sweet free from liability for any lack of informed consent. This jury finding is, of course, binding on this Court. Implicit in the jury finding is the view, necessarily adopted by this Court, that those of Sweet's patients that are involved here were kept fully apprized of Sweet's knowledge and proceeded voluntarily in light of it. The informed consent of the patients and their guardians, argues Mass General, ends any speculation that it was proceeding ultra vires with respect to them.

Had the federal government timely promulgated even the most rudimentary protocol for research experiments on human subjects, this Court would have a clear standard against which to measure the nature of the conduct of Sweet and Mass General. Massachusetts follows the salutary principle that even informed consent will not bar liability for a statutory violation. *See Henry v. Mansfield Beauty Acad., Inc.,* 353 Mass. 507, 510–11, 233 N.E.2d 22 (1968) (Raymond S. Wilkins, C.J.).[12] Here, had the Atomic Energy Commission promulgated relevant regulations, they would have had the force of statutory law and Sweet could have violated them only at his (and Mass General's) peril. There is here, however, no relevant protocol to which the Plaintiffs can point as having been violated by Sweet. The sad fact is that the Atomic Energy Commission ceded to the physicians involved the ability to establish whatever parameters they thought appropriate for experimentation on dying human patients.

■ Even so, the jury finding of informed consent does not determine Mass General's liability here. Unlike assumption of the risk, informed consent has never operated as a defense to a claim of negligence in Massachusetts. This is reasonable. A patient who grants informed consent to a medical procedure assumes the risk inherent in the proper administration of that procedure; that patient does not assume the risk that the physician, as did Sweet here, would administer the boron-neutron doses negligently, well after any hoped-for therapeutic value was manifestly absent. In short, the jury findings of negligence and informed consent are neither inconsistent nor mutually exclusive.

■ While Mass General thus was negligent along with Sweet, the doctrine of charitable immunity will relieve it from liability so long as its conduct was "charitable."

It was not.

Simply calling human experiments "research" does not make them "charitable" no matter the good faith of the physicians and hospital involved. One need not invoke the specter of the war crime trials of twenty Nazi physicians to make the point. *See* Anthony Szczygiel, *Beyond Informed Consent,* 21 Ohio N.U.L.Rev. 171, 194 (1994). It is impossible to characterize the Tuskegee Syphilis Study as "charitable." *See id.* at 195. Nor can the injection of live cancer cells into twenty-two cancer-free, chronically mentally-ill patients without their or their guardians' knowledge or

12. Federal law is to the contrary, at least with respect to the reach of the Federal Arbitration Act. The cases are legion that one who agrees to arbitrate a dispute gives up all manner of constitutional, statutory, and procedural protections, *see, e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 949 (11th Cir. 1999); *Design Strategy Corp. v. Nghiem,* 14 F.Supp.2d 298, 302 (S.D.N.Y.1998), even when such "agreement" comes as the entry fee to a sweeping array of modern economic activity, *see, e.g., Gilmer,* 500 U.S. at 20, 111 S.Ct. 1647; *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 17 (1st Cir.1999).

consent be defined as benevolent. *See Hyman v. Jewish Chronic Disease Hosp.*, 21 A.D.2d 495, 251 N.Y.S.2d 818, 820 (N.Y.App.Div.1964), *rev'd,* 15 N.Y.2d 317, 258 N.Y.S.2d 397, 206 N.E.2d 338 (N.Y. 1965). Further, no matter how liberal a construction is given to "charitable purpose," it does not encompass radiation "treatment" of institutionalized, mentally-retarded children. In the late 40s and early 50s, these children were given radioactive iron or radioactive calcium to study their effects as part of a "nutritional study." *See* ACHRE Report, Chapter 7: The Studies at the Fernald School, *available at* (visited on Sept. 27, 2000) <*http://tis–nt.eh.doe.gov/ohre/roadmap/achre/chap7–7.html*>. The children were persuaded to participate in the experiment by being offered special treats like extra milk, occasional outings, and membership in a "Science Club." *See id.* The judgment of history rightly condemns this conduct. In hindsight, it's simply not "charitable" and the good faith of the misguided participants would not protect them under Massachusetts law.

Here, by negligently persisting with boron injections after all hope of extending the lives of his patients or alleviating their suffering had vanished, Sweet violated that cardinal principle of the Hippocratic oath, "First, do no harm." The negligent harm done by Sweet here and imputed to Mass General was in no sense "charitable." Mass General simply cannot cloak conduct violative of medical ethics with charitable immunity. The jury verdict must stand.

## CONCLUSION

Defendants' Motion for Reduction of Jury Verdict is GRANTED. [docket no. 315]. The wrongful death statute in effect at the time the action arose, in 1961, is the correct statute. The statute of limitations was tolled. Mass General's Motion for Judgment as a Matter of Law on Charitable Immunity is DENIED. [docket no.

338]. Mass General is subject to the ordinary rules of liability.

SO ORDERED.